```
               UNITED STATES DISTRICT COURT

                        FOR THE

               WESTERN DISTRICT OF VIRGINIA

                   LYNCHBURG DIVISION


* * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,    * CRIMINAL NO. 6:13-CR-00003
                             * MARCH 28, 2013  4:04 p.m.
            Plaintiff,       * DETENTION HEARING
                             * VOLUME I OF I
vs.                          *
                             *
LES CHRISTOPHER BURNS,       * Before:
                             * HONORABLE ROBERT S. BALLOU
            Defendant.       * UNITED STATES MAGISTRATE JUDGE
* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:      ASHLEY B. NEESE, ESQUIRE
                        United States Attorney's Office
                        P.O. Box 1709
                        Roanoke, VA 24008


For the Defendant:      TERRY N. GRIMES, ESQUIRE
                        Terry N. Grimes, P.C.
                        Franklin Commons
                        320 Elm Avenue, S.W.
                        Roanoke, VA 24016



ECRO:                   R. MILLS



Transcriber:            JUDY K. WEBB, RPR
                        P.O. Box 1234
                        Roanoke, Virginia 24006
                        (540)857-5100 Ext. 5333


        Proceedings recorded by electronic recording,
transcript produced by computer.
```

1                    I N D E X
                                                    Further
2                   Direct   Cross   Redirect   Recross   Redirect

3   WITNESSES FOR THE
     GOVERNMENT:
4   Chris Cook              3      10        14

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Court convened at 4:04 p.m.)

2          THE COURT:  Have a seat at the table, Mr. Burns.

3          All right, we're back on the record in the matter of

4  *United States v. Les Christopher Burns*, the government's

5  motion for detention as to Mr. Burns.

6          Ms. Neese, are you ready to proceed?

7          MS. NEESE:  We are, Your Honor.

8          THE COURT:  Are you ready to proceed, Mr. Grimes?

9          MR. GRIMES:  Yes, Your Honor.

10         THE COURT:  All right.  Call your first witness.

11         MS. NEESE:  Your Honor, we would call Investigator

12  Chris Cook, Bedford County.

13         THE CLERK:  Raise your right hand.

14          CHRIS COOK, GOVERNMENT'S WITNESS, SWORN

15                    DIRECT EXAMINATION

16  BY MS. NEESE:

17  Q    Please state your name for the record, and tell us how

18  you're employed.

19  A    Chris Cook, investigator for Bedford County Sheriff's

20  Office.

21  Q    And in your employment position, do you know Les

22  Christopher Burns, the defendant here today?

23  A    I do.

24  Q    How long have you known Mr. Burns?

25  A    For less than a year.  Approximately three to four

1  months, I would say.

2  Q    Have you known him throughout this investigation?

3  A    I have.

4  Q    And is this investigation involving Mr. Burns and

5  numerous other people?

6  A    It is.

7  Q    Could you tell the Court what happened yesterday.

8  A    Yesterday a search warrant was executed at Mr. Burns's

9  residence, 414 Franklin Street in Bedford City.

10  Q    Before that, was he arrested?

11  A    That's correct.

12  Q    Was he arrested on the charges here today?

13  A    Yes, he was.

14  Q    What was the search warrant for?

15  A    The search warrant was in reference to an insurance fraud

16  that he was under investigation by Bedford City.

17  Q    Now, did you actually conduct the search warrant, or did

18  you come back to the office?

19  A    I returned to the Bedford County Sheriff's Office to

20  interview Mr. Burns.

21  Q    And what was your position in that interview?  Were you

22  someone who sat in and talked to Mr. Burns?

23  A    I was.

24  Q    Did you provide him with his rights?

25  A    I did.  Prior to leaving his residence, when he was in

1  the patrol car, I advised Mr. Burns of his rights.

2  Q    Did you talk to him?

3  A    I did.

4  Q    Did he agree to speak?

5  A    He did.

6  Q    What did he state to you?

7  A    At his residence or once we went to the sheriff's office?

8  Q    Once he came to the sheriff's office.

9  A    Once we came to the sheriff's office, he stated that he

10 had been using prescription medications, Roxicodone,

11 methadone, Suboxone, heroin, other drugs, for about ten years.

12 Q    And did he state anything regarding the ongoing

13 investigation and prosecution of this case?

14 A    He stated that he had distributed various types of drugs

15 since approximately 2010.

16 Q    And did he state to how many people?

17 A    He stated that he distributed to approximately ten people

18 during that timeframe.

19 Q    Prior to this interview, had you had contact with

20 Mr. Burns?

21 A    I had.

22 Q    Did you advise him that there was a controlled purchase

23 involving him, made on March 8th of 2012 -- or '13?

24 A    I hadn't.

25 Q    I meant during this conversation with him yesterday.

1    A    Yes.

2    Q    Did he talk to you about any of that?

3    A    I don't recall him making any statements or reference to

4    the controlled purchase.

5    Q    Did he make any statements about Suboxone recently?

6    A    He stated that he had used Suboxone recently, and had

7    distributed within the past couple of weeks.

8    Q    In Count Twenty-two of the superseding indictment, is it

9    charging him with aiding and abetting in the distribution of

10   Suboxone?

11   A    It is.

12   Q    Did he make any statements about if he had previously

13   used either that day or in the prior few days?

14   A    He stated that he had recently used Suboxone.

15   Q    Did he state anything about heroin?

16   A    He stated that he had used heroin, but I don't recall if

17   it had been recently.

18   Q    In your employment position during the last two weeks,

19   have you used a confidential informant to go into either

20   Mr. Burns's house or make contact with him outside of his

21   house regarding certain controlled substances?

22   A    Yes, that is correct, I have.

23   Q    And at that point in time, based on the last few weeks,

24   has Mr. Burns been using prescription controlled substances --

25   prescription drugs or other controlled substances?

1  A    Yes.

2  Q    Now, regarding yesterday, did you also have the

3  opportunity to talk with the agents that executed the search

4  warrant?

5  A    I did.

6  Q    And what happened there?

7  A    During the search of the residence, empty heroin bags and

8  needles were seized within the residence.

9  Q    Do you know who else lives in that residence?

10 A    Mr. Burns's wife, Tara Burns.

11 Q    Does he have any kids?

12 A    He has two female girls that are there.

13 Q    Are they minors?

14 A    Yes.

15 Q    And these were found in the same residence that they live

16 in?

17 A    That's correct.

18 Q    Did you have the opportunity to talk to Mr. Burns's wife?

19 A    I did.

20 Q    Did she make any statements regarding her knowledge of

21 Mr. Burns's usage of controlled substances?

22 A    She stated that she knew that Mr. Burns had used drugs in

23 the past, knew that he had injected drugs in the past, but did

24 not -- was not aware of any current usage.

25 Q    Did she make any other statements regarding whether or

1  not she knew he distributed drugs?

2  A   No, I don't recall any statements in reference to her

3  knowledge.

4  Q   Did she make any statements regarding any ultimatums she

5  had placed on Mr. Burns?

6  A   She told Mr. Burns if he didn't stop using, that he would

7  have to leave, I believe is what she said.

8  Q   Was there also an issue regarding an SD card?

9  A   Yes.

10  Q   And certain indications that he had taken things from the

11  police before?

12  A   That's correct.

13  Q   Did he make any statements involving that?

14  A   He removed an SD card from a device that was owned by the

15  sheriff's office, during a controlled purchase in which he was

16  working for us.

17         THE COURT:  What is an SD card?

18         THE WITNESS:  An SD card is like a memory card of the

19  recordings, from the device.

20         THE COURT:  All right.

21  BY MS. NEESE:

22  Q   Not to go into that, what I was going to ask you is,

23  though, did he make any statements that he's ever taken

24  anything from the sheriff's department or any police in

25  general?

1    A    Yes.

2    Q    Is that also something that would go to his ability to

3    tell the truth?

4    A    Correct.

5    Q    Regarding his statement, did he make any statements about

6    shooting other individuals up?

7    A    He did.  He stated that one particular individual was a

8    female juvenile that he had injected with prescription

9    medication, pills, four to five different times.

10   Q    Was she a juvenile at the time that he injected her?

11   A    He stated that he was aware that she was a juvenile at

12   the time he was injecting her.

13   Q    Has she also been interviewed and provided grand jury

14   testimony in this case?

15   A    Yes.

16   Q    Did she also confirm those statements?

17   A    Not to me, but I have been told that she has confirmed

18   that, yes.

19   Q    And that's essentially why Mr. Burns was confronted about

20   that issue yesterday?

21   A    Yes.

22   Q    Regarding the potential insurance fraud claim, was there

23   also a firearm in that house?

24   A    Yes, there was.

25   Q    And where was it located?

1  A     He reported that the firearm was in a safe within his

2  residence.

3  Q     Did he indicate he knew he wasn't supposed to be around

4  firearms?

5  A     He did.

6  Q     Did you talk to the wife about that?

7  A     We did.

8  Q     Did she indicate that he had gotten into the safe before?

9  A     That's correct.

10 Q     Did she also indicate that he had used the firearm in her

11 presence?

12 A     Several different occasions.

13         MS. NEESE:  No further questions of this witness.

14         THE COURT:  All right, Mr. Grimes.

15         MR. GRIMES:  Thank you, Your Honor.

16                     CROSS-EXAMINATION

17 BY MR. GRIMES:

18 Q     Good afternoon, Officer.

19 A     Good afternoon.

20 Q     Let me start at the end and work my way backwards.

21        Do I gather from your testimony that there came a time

22 when Mr. Burns began working as an informant?

23 A     That's correct.

24 Q     When was that?

25 A     Within the past several months.

1    Q    So this year?  Last year?

2    A    Both.  Both.

3    Q    I couldn't hear you, sir.

4    A    Both.  The end of last year I believe is when he started.

5    Q    Was he involved in controlled buys?

6    A    He was.

7    Q    And then did something go wrong and, as a result, he was

8    arrested?

9    A    No, sir.

10   Q    He was working as an informant as recently as when, then?

11   A    I would say a little over a month, maybe.

12   Q    Before the date of the offense alleged in the 22nd

13   paragraph of the indictment, 22nd count, which is March 8th,

14   2013; is that true?

15   A    He was not working as an informant then, no.

16   Q    Then?

17   A    No.

18   Q    And that count alleges he knowingly and intentionally

19   distributed Suboxone.  So tell us for the record what Suboxone

20   is.

21   A    Suboxone is a prescription tablet, Schedule III drug.

22   Q    That's used for what purposes?

23   A    I think Suboxone is used for people that are trying to

24   stop using narcotics, if I'm correct.

25   Q    Now, with respect to his use of prescription drugs, one

1   of the things you said is that your information and his

2   statement is he uses prescription drugs; is that true?

3   A    That's correct.

4   Q    I don't know whether you've seen -- you may not have seen

5   this pretrial services report.  Have you seen that or not?

6   A    No, sir.

7   Q    One of the things that document says is that Mr. Burns

8   was involved in an automobile accident in 2008, and that as a

9   result, surgery was required to implant steel plates in his

10  neck; and that since that time, he has been prescribed various

11  prescription drugs, including Oxycodone for pain, Ambien for

12  sleep, and Soma for inflammation.  Were you aware of that?

13  A    No, sir.

14  Q    One of the things you said on direct was that you found

15  empty heroin bags and needles in the house.  Were they

16  field-tested for heroin?

17  A    The officers executing the search warrant found the empty

18  bags, and I'm not aware if they were tested or not.

19  Q    Why do you say they were heroin bags?  Do you know

20  whether any heroin was found in them?

21  A    I'm not aware of that.

22  Q    So there were bags and needles found in the house?

23  A    Correct.

24  Q    You've told us that the defendant said he has used heroin

25  in the past.  And that begs the question:  What is "in the

1  past"?  Did you ask?

2  A    Well, he stated that in the past ten years he started

3  using drugs, so I would assume within the past ten years.

4  Q    Sometime in the past ten years, that's most that can be

5  said?

6  A    Through information that we received, recently as well.

7  Q    Okay.  What does "recently" mean?

8  A    I would say within the past several months is the recent

9  information that we have.

10  Q    Say that again.  I couldn't hear the last thing.

11  A    The most recent information we have, within the past

12  several months.

13  Q    All right, sir.  And you told us the defendant said he

14  used, quote, "various types of drugs," close quotes, since

15  2010.  And did you ask him, "Well, did you have prescriptions

16  for some of those?"

17  A    No, sir.  During that interview, he stated that he

18  obtained those drugs illegally, by purchasing them from

19  certain subjects --

20  Q    When you say -- can I get the last thing you said?

21  A    He purchased the drugs from subjects that are involved in

22  the conspiracy.

23  Q    Okay.  And "various types of drugs," what drugs are you

24  talking about, sir?

25  A    Roxicodone, methadone specifically.

Cook — Redirect

1  Q    Those two?

2  A    Yes, sir.  And Suboxone.

3         MR. GRIMES:  All right, sir.  Thank you.  That's all

4  that I have.

5         THE COURT:  Let me ask you a couple of questions,

6  Deputy Cook.  This issue about injecting a 16-year-old, was

7  that something that Mr. Burns told you that he did?

8         THE WITNESS:  Yes, sir, during the interview

9  yesterday.

10         THE COURT:  How long ago did he say that he did that?

11         THE WITNESS:  If I'm not mistaken, I believe about a

12  year and a half ago.

13         THE COURT:  And have you seen any of the items or

14  pictures of the items that were taken in the search warrant?

15         THE WITNESS:  No, sir.

16         THE COURT:  All right.  Ms. Neese, anything further?

17         MS. NEESE:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MS. NEESE:

20  Q    Investigator Cook, do you know what type of Oxycodone

21  that Mr. Burns is prescribed?

22  A    I'm not aware.

23  Q    So you don't know if it's Oxy 5s or Oxy 30s?

24  A    No.

25  Q    Much difference between Oxy 5s and Oxy 30s?

Cook – Redirect

```
 1   A      Yes.

 2   Q      Is this case involving a lot of Oxy 30s --

 3   A      Yes.

 4   Q      -- and the distribution of?

 5   A      Yes, it is.

 6   Q      What about Dilaudids?  Was he prescribed Dilaudids?

 7   A      Not that I'm aware of.

 8   Q      Did he admit that he got them from numerous other places?

 9   A      He did.

10   Q      Did he admit that he sold them to numerous other people?

11   A      Yes.

12   Q      Are Dilaudids known on the street to be something that

13   would be shot up?

14   A      Yes.

15   Q      Is that different than meth -- or, excuse me, heroin?

16   A      Yes.

17   Q      In the last few days, did he make admissions that not

18   only did he use Suboxone, but other controlled substances?

19   A      He did.

20   Q      Was morphine one of those?

21   A      I don't recall him saying morphine.  I remember Suboxone,

22   but it's possible.

23   Q      Did he state whether or not he had turned anybody on to

24   Suboxone in the last week or so?

25   A      He said that he had, several different --
```

1  Q    Did he say whether he had used it with other individuals

2  in the last week or so?

3  A    Yes.

4          MS. NEESE:  No further questions at this time, Your

5  Honor.

6          THE COURT:  All right.  Does that prompt anything

7  further, Mr. Grimes?

8          MR. GRIMES:  It does not, Your Honor.

9          THE COURT:  Thank you, Deputy.  You may step down.

10          Anything further beyond the pretrial services report,

11  Ms. Neese?

12          MS. NEESE:  Give me just one second to see here.

13          Your Honor, if you'll accept the pretrial services

14  report as written, we won't call Ms. Martin to the stand.  If

15  not, if we've got to get more detailed than that, we can go

16  and call her to the stand.

17          THE COURT:  I'll accept it.

18          All right.  Mr. Grimes, any evidence?

19          MR. GRIMES:  No evidence at this time, Your Honor.

20          THE COURT:  All right.  One question, Ms. Neese, as

21  to Count Twenty-two --

22          MS. NEESE:  Yes, sir, Your Honor.

23          THE COURT:  -- what I'll call the Suboxone count in

24  March of this year, how much is it the government's contention

25  was distributed in that particular incident?

1          MS. NEESE:  Your Honor, it's either one or two pills
2  in that particular instance.

3          Does the Court have any questions regarding Count One
4  and the distribution of numerous controlled substances?

5          THE COURT:  Well, I was going to -- that's somewhat
6  been covered.

7          What is the nature of the evidence, just summarize
8  for me, proffer it, and if Mr. Grimes wishes for it to be --
9  come in through a witness, we can do that.  But if you can
10  just proffer generally what the government's allegations are
11  as to Mr. Burns.

12          MS. NEESE:  Long and complicated, Your Honor.

13          But essentially, breaking down the 2- to 3,000 pages
14  of discovery, we put between 60 and 70 witnesses in the grand
15  jury.  We've got numerous witnesses indicating that Mr. Burns
16  was a distributor of medications.  Was he one of the ones that
17  was getting the medications, the Roxi 30s, the methadones, the
18  Adderall, the oxymorphone or the hydromorphone or the
19  Suboxone?  No, he was not.

20          He did have a prescription for Oxycodone,
21  5 milligrams.  Much different than the Oxycontin 80s and the
22  Oxycontin 30s, where, as you well know, that the milligrams --
23  the dollar per milligram on the street, correct?  So if it was
24  an Oxy 5, he would probably be selling it for $5.  But -- or
25  not him necessarily, but somebody on the street would be

1  selling it.  If it was an Oxy 30, they would be selling it for
2  30 to 35.  I think they're even going for $40 now because
3  they're getting cut off so much.
4      So we've got numerous witness testimony, including a
5  16-year-old minor who has testified that she got pills from
6  him on numerous occasions, and he actually injected her with
7  those pills.
8      Then we have numerous other witnesses indicating that
9  he was a heroin user and that occasionally he would distribute
10 heroin as well.
11     THE COURT:  All right.  Okay.  Any additional
12 argument, Ms. Neese, other than what's already out there?
13     MS. NEESE:  Your Honor, it concerns us gravely,
14 honestly, now it's come out that he used to work for Bedford
15 County in this position, knowing that he was in this position,
16 he had state charges over his head at the time.  Then there
17 comes a point where he allegedly steals something from the
18 police department.  He stops working as a confidential
19 informant.  He is still involved in this distribution ring.
20 He is selling Suboxone and/or aiding and abetting in the
21 distribution of Suboxone.  He admitted yesterday that he
22 turned someone else on in the last couple of weeks, and that
23 he used Suboxone in the last couple of weeks.
24     Suboxone is a Schedule III controlled substance.
25 But, see, since Dr. Salerian has been cut off and can no

1  longer issue Schedule IIs, and people are scrambling to go to

2  other doctors, it's really hard right now to get those

3  medications.  And like I said, it's very different for the

4  pricing out on the street.

5        Mr. Burns has been in this since at least the age of

6  21.  Approximately ten years he has been distributing.  His

7  wife told us yesterday, as Investigator Cook stated, he even

8  lies to her about this.  He has got needles and alleged heroin

9  baggies in his house during this time period, where he lives

10  with two kids.

11        At this point in time, we just don't feel like he can

12  be trusted.  Not only is he a danger, but if you take a look

13  at the pretrial services report, his criminal history includes

14  contempt of court and numerous -- or at least two -- excuse

15  me, one failure to appear that he was convicted of, one

16  contempt of court he was convicted of; another failure to

17  appear, the disposition was not received; and then another

18  contempt of court, the disposition was not received.

19        Those are indications, too, that he could be a flight

20  risk.  I wouldn't necessarily rely on the flight risk.  I

21  would more necessarily rely on the danger to the community

22  that he is by distributing this medication to other

23  individuals -- not medication, these controlled substances

24  that they're not allowed to be having, and also using

25  controlled substances, along with everything else we put

1  forth.

2          THE COURT:  All right.  Thank you.

3          All right.  Mr. Grimes, first of all, do you wish --

4  come on up.  Do you wish any further detailed testimony as to

5  what the government's allegations are in Count One as to

6  Mr. Burns?

7          MR. GRIMES:  Not with respect to the bond hearing,

8  Your Honor.

9          THE COURT:  All right.  Any argument?

10          MR. GRIMES:  Well, what I know about this case,

11  having been asked to be here this afternoon, is that

12  apparently this conspiracy had been going on for a period of

13  time.  My information is that the original indictment came

14  down in January of 2012.  I may or may not be right about

15  that, but at any rate, for a period of time.

16          And then we have here a superseding indictment.

17  Whether it's a first or second superseding, I don't know yet.

18  But on March 21, 2013, the United States added Mr. Burns as

19  the last defendant in the conspiracy, and put in this Count

20  Twenty-two an allegation that he distributed Suboxone.  And

21  now we find out it's one or two pills of it on March 8, 2013,

22  earlier this month.

23          What we also learned from the evidence is that for a

24  period of time, several months, extending into sometime last

25  year, Mr. Burns was apparently working for -- as a controlled

1  informant for officers of Bedford County; maybe a joint task

2  force, I don't know.  And now he finds himself in the

3  indictment.  So it just sounds like that somebody is not happy

4  with his performance for whatever reason.

5        Now he finds himself at defense counsel's table,

6  because the United States says he's been involved in this

7  conspiracy since age 21, or drug distribution since age 21.  I

8  think he's 30 or 31 now, so that's about ten years.  So you

9  would have expected his name to be higher up in this

10  indictment than it was.

11        He was just indicted, as I say, on March 21st, which

12  was about a week ago.

13        So does he have a drug use problem?  That may well be

14  the case.  He's not the first person who stood before you with

15  a drug use problem.

16        He has some prescription medication as a result of an

17  auto accident.  That's reflected by the pretrial services

18  report.

19        With respect to flight risk, he is a long-term

20  resident of the community, has a wife and children.  His

21  mother, for the record, is seated in the back of the

22  courtroom.  He has got some family support in this area.

23        I keep hearing this reference to heroin bags, but

24  when pressed on cross-examination, as it turns out, there's no

25  evidence that what was in those bags was heroin, heroin at

1  all.

2      I also heard a reference from the prosecutor to the

3  use of morphine, though the evidence doesn't indicate the use

4  of morphine at all.  So it's a little difficult, really, to

5  find out what's going on here and what isn't.

6      At the end of the day, I ask the Court to set a

7  $10,000 unsecured bond for Mr. Burns.  He's indigent, that's

8  why I'm appointed to represent him.  He has no assets.  But a

9  $10,000 unsecured bond ought to be sufficient to ensure his

10  presence going forward.

11      I point out, as the Court knows, it should go without

12  saying that he's in fact presumed innocent, despite everything

13  you've heard here today, and he ought to be entitled to bond

14  in this case.

15      THE COURT:  All right.  Thank you, Mr. Grimes.

16      Ms. Neese, anything further?

17      MS. NEESE:  Your Honor, if I remember correctly,

18  Investigator Cook testified that he had been involved in this

19  current conspiracy since 2010, and that he had been using

20  these types of controlled substances since 2001 or 2002,

21  whenever he was 21 years old, approximately ten years ago.

22  Nothing further than that, besides what I've already said.

23      THE COURT:  All right.

24      All right.  Mr. Burns, if I could get you to stand

25  up, I would be much obliged, sir.

1          All right.  Mr. Burns, the question that the Court

2   has in front of it whenever these issues arise is two-fold.

3          First of all, are you a flight risk?

4          THE DEFENDANT:  No.

5          THE COURT:  And secondly, are you a danger to the

6   community or to others?

7          And so let me address both of those.  And there's a

8   statute that guides what I do, and I'll talk my way through

9   it.

10          First of all, the Supreme Court has always said in

11  these circumstances, release is preferable, and it's

12  preferable to find terms and conditions of release if it's at

13  all possible.

14          Secondly, Mr. Grimes is exactly right, that you are

15  presumed innocent.  The statute makes that absolutely clear.

16  I told you that when you were here earlier today, and I

17  remember that.  And I don't take lightly the fact that you are

18  presumed innocent as I make my decision.

19          That much being said, the statute that guides my

20  decision, first of all, establishes a presumption that you're

21  to be detained.  The presumption is that, based upon the fact

22  that this matter involves the distribution of controlled

23  substances for which there's a maximum term of more than ten

24  years, there is a presumption that the government can detain

25  you.  It's a presumption that can be overcome by evidence.

1  But, ultimately, if you come forward with some evidence, the

2  burden still remains upon the government to establish by clear

3  and convincing evidence that you're a danger to the community.

4      I don't find that you're a flight risk at all, and so

5  the entire focus of my discussion is whether you're a danger

6  to the community.

7      I then take into account the nature and circumstances

8  of the charges that you face.  And you face charges in two

9  counts, Counts One and Count Twenty-two.  Count Twenty-two is

10 distribution of a couple of pills that occurred, if the

11 government's evidence is to be believed, about three weeks

12 ago, on March the 8th of this year.

13      Count One is more complicated, as Ms. Neese

14 explained.  Deputy Cook did explain in his testimony that you

15 had been involved in the distribution of drugs since 2010, and

16 perhaps the use of drugs personally for much longer.  So the

17 nature of the offense as involved cuts in favor of the

18 government.

19      Second, whether or not -- what your past history is.

20 And your past history reflects there are some, primarily,

21 charges which you have faced for failure to appear.

22      There was a probation violation for which you were

23 sentenced to 12 months in jail on August the 31st, 2012.  That

24 was suspended, and you were placed on a supervised probation.

25 And I'm understanding you're still on supervised probation

1  with the state; is that correct?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And the allegations are that you're

4  involved in this activity while on supervised probation, which

5  also cuts against you.

6          The allegations that I believe that, frankly, carry

7  the day for me are the fact that you live at home with your

8  two young daughters, there are needles that are found in your

9  house, and there's no reason -- no evidence as to why needles

10 should be in your house at this point in time.  There is

11 evidence and testimony from Deputy Cook that you are a heroin

12 user.  And that in the conversation with you yesterday, that

13 you had admitted that, through your drug use, you had been

14 involved with the injection of a minor with controlled

15 substances.

16         Based upon all of that, I do find there's clear and

17 convincing evidence that you're a danger to the community.

18 I'm going to remand you to the custody of the marshal for you

19 to stay for as long as these charges are pending.

20         Understand, Mr. Burns, you have a right to appeal

21 this decision to the presiding district court judge, who can

22 hear the evidence and make any decision that he thinks is

23 appropriate if he disagrees with my decision.  But that's

24 going to be my decision at this point in time, and I'm

25 remanding you to the custody of the marshal.

1          Ms. Neese, anything further we need to take up?

2          MS. NEESE:  Not at this time, Your Honor.

3          THE COURT:  Mr. Grimes, anything further we need to

4   take up?

5          MR. GRIMES:  No, Your Honor.

6          THE COURT:  All right, very well.  The Court will

7   stand in recess.

8       (Court recessed at 4:35 p.m.)

9

10                      CERTIFICATE

11     I, Judy K. Webb, certify that the foregoing is a correct

12  transcript from the official electronic sound recording of the

13  proceedings in the above-entitled matter.

14

15  /s/ Judy K. Webb          Date:  4/19/2013

16

17

18

19

20

21

22

23

24

25