1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF VIRGINIA

3             6:13-cr-00003-NKM-18

4    *****************************************************

5    UNITED STATES OF AMERICA,

6                    Plaintiff,

7    vs.

8    LES CHRISTOPHER BURNS,

9                    Defendant.

10   *****************************************************

11

12               Hearing before

13          The Honorable Norman K. Moon

14           9:32 a.m.  -  10:48 a.m.

15              April 25, 2013

16             Lynchburg, Virginia

17

18

19

20

21

22

23

24   Job No. 21851

25   REPORTED BY:  Darlene Joy Owings, Court Reporter

(434) 293-3300
www.cavalier-reporting.com
Cavalier Reporting & Videography
info@cavalier-reporting.com
(800) 972-9393

6:13-cr-00003-NKM   Document 660   Filed 02/18/14   Page 1 of 91   Pageid#: 2763

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4    ASHLEY BROOKE NEESE, ESQUIRE
      UNITED STATES ATTORNEYS OFFICE
 5    310 First Street, Southwest, Room 906
      Roanoke, Virginia  24008
 6    (540) 857-2250
      ashley.neese@usdoj.gov
 7
      Counsel on behalf of Plaintiff
 8

 9

10    TERRY NEILL GRIMES, ESQUIRE
      TERRY N. GRIMES, ESQUIRE, PC
11    Franklin Commons
      320 Elm Avenue, Southwest
12    Roanoke, Virginia  24016
      (540) 345-6572
13    tgrimes@terryngrimes.com

14    Counsel on behalf of Defendant

15

16

17

18

19

20

21

22

23

24

25
```

Case 7:13-cr-00003-NKM   Document 140   Filed 02/18/14   Page 2 of 91   Pageid#: 2764

```
 1                      I N D E X

 2

 3    Opening Statement by Mr. Grimes . . . . . . .      4

 4    Opening Statement by Ms. Neese  . . . . . . .     15

 5

 6    DEPUTY JOE REYNOLDS:

 7    Direct Examination by Ms. Neese . . . . . . .     27
      Cross-Examination by Mr. Grimes . . . . . . .     48
 8    Redirect Examination by Ms. Neese . . . . . .     60

 9

10    GINA SMITH:

11    Direct Examination by Mr. Grimes  . . . . . .     64
      Cross-Examination by Ms. Neese  . . . . . . .     66
12

13    Closing Statement by Ms. Neese  . . . . . . .     67
      Closing Statement by Mr. Grimes . . . . . . .     69
14    Closing Statement by Ms. Neese  . . . . . . .     75

15    Ruling by Judge . . . . . . . . . . . . . . .     78

16

17                    E X H I B T S

18    1        Copy of Indictment  . . . . . . . . .      5

19    2        Grand Jury Testimony  . . . . . . . .      5

20    3        Copy of Indictment  . . . . . . . . .      5

21    4        Unidentified Exhibit  . . . . . . . .      5

22    5        Grand Jury Transcript . . . . . . . .      5

23    6        Search Warrant and Return . . . . . .      5

24

25
```

```
 1   (Commencing at 9:32 a.m., February 25, 2013)

 2

 3              P R O C E E D I N G S

 4        THE COURT:  Good morning.

 5        MR. GRIMES:  Good morning, Your Honor.

 6        MS. NEESE:  Good morning, Your Honor.

 7        THE COURT:  Call the case, please.

 8        CLERK:  Yes, sir.  This is Criminal

 9   Action Number 6-13-cr-3, United States of

10   America versus Les Christopher Burns,

11   Defendant Number 18.

12        THE COURT:  Is the Government ready?

13        MS. NEESE:  We are, Your Honor.

14        THE COURT:  Is the Defendant ready?

15        MR. GRIMES:  Yes, sir, Your Honor.

16        THE COURT:  All right.  I guess we're

17   here on your motion, then.

18        MR. GRIMES:  Yes, Your Honor.

19        THE COURT:  You may proceed.

20        MR. GRIMES:  Your Honor, we begin by

21   giving the Court some historical background.

22        THE COURT:  Okay.  Let me say, I have

23   reviewed the transcript of the Magistrate's

24   hearing.

25        MR. GRIMES:  Thank you, Your Honor.
```

(434) 293-3300
www.cavalier-reporting.com

Recorded by Digital Court
Cavalier Reporting & Videography

(800) 972-4093
info@cavalier-reporting.com

Case 6:13-cr-00003-NKM   Document 660   Filed 02/18/14   Page 4 of 91   Pageid#: 20760

1          Let me tender to the Court six

2    documents, which we'll ask to be marked

3    Exhibits 1 through 6 for today's hearing.

4          (Whereupon, Defendant's Exhibit Numbers

5          1 through 6 were marked and received in

6          evidence.)

7          MR. GRIMES:  All right.  By way of

8    historical background, Your Honor, in October

9    of 2012, Les Christopher Burns, who you will

10   see referred to in the paperwork from time to

11   time as Chris Burns or Chris, was pulled over

12   by the Bedford County authorities for a

13   routine traffic violation.  And in his vehicle

14   was found certain prescription drugs.

15          And after some conversations with the

16   authorities in Bedford County, he began

17   working as a controlled informant for the

18   Government involved in sales and buys of

19   prescriptions drugs over a period of months,

20   until shortly before the indictment was

21   returned against him in March of 2013.  His

22   handler or the officer in charge of Mr. Burns

23   was Investigator Cook with the Bedford County

24   Sheriff's Department.

25          On October 4th of 2012, husband and

(434) 293-3300
www.cavalier-reporting.com

Case 4:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 5 of 91   Pageid#: 1093

Rapidly Delivered Online
Cavalier Reporting & Videography

(800) 296-7393
info@cavalier-reporting.com

1    wife, Bryant and Danielle Reynolds were

2    indicted in Case Number 6:12-cr-00031, with

3    conspiracy to distribute methamphetamine.  For

4    today's hearing, Your Honor, that will be

5    Exhibit 1.  I've handed the Court a copy of

6    the indictment, which the Clerk has before

7    her.  This, of course, is also a matter of

8    public record, being part of the docket in a

9    related proceeding before this Court.

10           Then on December 20, 2012, Burns, as a

11   cooperating witness, was called to testify

12   before the grand jury.  We have his grand jury

13   testimony, which will be Exhibit 4 for today's

14   hearing.  And was questioned by the Assistant

15   United States Attorney, Ashley Neese, about

16   his involvement with the buys and sells of

17   drugs while working as an informant for the

18   Government.

19           And if the Court looks on Page 3 of

20   that transcript, Ms. Neese told Mr. Burns, and

21   I'm quoting now:  "You are not a target of the

22   investigation.  If you were a target of the

23   investigation, we would notify you that you

24   are a target of an investigation.  And if you

25   are qualified, then you receive

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/13/14   Page 6 of 91   Pageid#: 276

Rapid Gold Direct Output
Cavalier Reporting & Videography

(800) 972-2993
info@cavalier-reporting.com

1    court-appointed counsel.  Do you understand

2    that?"

3         Mr. Burns was unrepresented at that

4    first testimony before the grand jury on

5    December 20th of 2012.  He continues to work

6    as an informant for the Government.

7         Moving forward in time to January 17 of

8    2013, the same people indicted in Case Number

9    6:12-cr-00031, that is Bryant and Danielle

10   Reynolds, were indicted, along with eight

11   others, this time for a second conspiracy.

12   That is a conspiracy to distribute certain

13   Schedule 1, 2 and 3 controlled narcotics.

14   They're listed in the indictment.  Which

15   simply, for the convenience of the record, I

16   offer as Exhibit 2 with respect to today's

17   hearing.  You'll see there, among the

18   defendants, are Bryant and Danielle Reynolds,

19   along with eight others persons, who were

20   named there.

21        Again moving forward in time, Burns is

22   called a second time to testify before the

23   grand jury on February 21, 2013.  That

24   transcript, again, is tendered for the record.

25   And that will be Exhibit 5.  Incidentally,

1      when he testified first before the grand jury

2      in December of 2012, he told the grand jury

3      that he had had a problem with the use of

4      prescription drugs for a number of years.  All

5      of that is a matter of record in his grand

6      jury testimony.

7              All right.  Back to where I was.

8      February 21, 2013, Burns testifies before the

9      grand jury a second time.  Now, he never

10     received the target letter, as the U.S.

11     Attorney said he would receive when he

12     testified in December.  And it becomes

13     apparent when you read that grand jury

14     testimony, that he is now a target of the

15     investigation.  And things went south between

16     him and Investigator Cook for reasons that

17     will become apparent; probably not today, but

18     a later point during these proceedings.

19             Anyway, he testifies without counsel;

20     no retained counsel, no court-appointed

21     counsel before the grand jury on December 21,

22     2013.  Readily apparent that he's now a

23     target.

24             So moving forward in time, one month

25     later to the day, March 21, 2013, a

 1     superceding indictment is filed in our case

 2     6:13-cr-00003, which again, just for

 3     convenience, I've filed with the Court,

 4     Exhibit 3, for the purpose of today's hearing.

 5     And if you take a look at that indictment,

 6     that superceding indictment, you'll see that

 7     Burns now has been added as the last defendant

 8     on the first page of the indictment.  And if

 9     you turn to Count 22, you'll see that a

10     subsequent count has now been added against

11     Burns, which alleges on or about March 8,

12     2013, Mr. Burns distributed Suboxone, which is

13     a Schedule 3 controlled substance.

14          Your Honor, as you have read the

15     transcript of the detention hearing before

16     Judge Ballou, you'll see that the United

17     States says, that's a drug that people take to

18     come down off of other drugs, to help them get

19     off of other drugs.  And at that hearing,

20     Ms. Neese testified -- said, we just couldn't

21     trust him anymore.

22          And so, then if you'll compare the

23     first and second indictment, you'll see that

24     the offense dates in the first indictment say

25     in Paragraph 1, that the conspiracy began in

(434) 293-3300
www.cavalier-reporting.com

Case 6:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 9 of 91   Pageid#: 2071

Reported by: Diane J. Daniels
Cavalier Reporting & Videography

(800) 972-1993
info@cavalier-reporting.com

1    or about 2009, and continued to on or about

2    December 20, 2012.  Your Honor, December 20,

3    2012, is when Burns testified before the grand

4    jury the first time.

5         Now if you'll look at the superceding

6    indictment, again, referring to Paragraph 1.

7    Now it says that the date of the conspiracy is

8    on or about 2009, continuing to on or about

9    March 8, 2013, which is the offense date for

10   the alleged distribution of Suboxone in Count

11   22 of the superceding indictment.

12        So, in other words, according to the

13   United States, the last day of the conspiracy

14   in the superceding indictment is the date Mr.

15   Burns was alleged to have distributed Suboxone

16   to somebody.

17        All right.  Coming forward in time

18   again, there will be allegations that

19   Mr. Burns had some cameras in his home, was

20   recording the drug transactions he was

21   involved in working for the Government.  And

22   there was a break-in at his house.  There's an

23   allegation that, while he and his wife were at

24   Myrtle Beach around Valentine's Day in 2013,

25   someone broke into their house and stole a

1        number of computer disks.  I'll call them hard

2        drives.  Anyway, some sort of computer memory

3        that was on the camera that was recording

4        things.

5             There's also an allegation that, at

6        some point, Mr. Burns and Mr. Cook did not

7        trust each other.  Mr. Burns began recording

8        conversations with Investigator Cook.  And

9        that disk is now missing as well.  There's an

10       allegation that it was stolen.

11            A search warrant was issued by Bedford

12       County.  Remember that Investigator Cook of

13       Bedford County is Mr. Burns' handler with

14       respect to his work as a controlled informant.

15            So on March 26, 2013, a search warrant

16       was issued by Bedford County.  The search

17       warrant and return is Exhibit 6 in your packet

18       of materials.

19            Your Honor, turning to the transcript

20       which the Court has read, Investigator Cook

21       testified at that hearing, and I'm referring

22       specifically to Page 7, that certain needles,

23       and he called them empty bags of heroin, they

24       were really just plastic bags, were found

25       within the residence.  Here's the questioning

(434) 293-3300                   Reported by Sharon L. Gilbert                   (800) 972-8937
www.cavalier-reporting.com            Cavalier Reporting & Videography            info@cavalier-reporting.com

1    on Page 7 of the hearing before Judge Ballou.

2    And this, for the record, was -- the date of

3    this is March 28, 2013, Line 6.

4            Question:  "And what happened there?"

5            Answer, this is Investigator Cook

6    speaking:  "During the search of the

7    residence, empty heroin bags and needles were

8    seized within the residence."

9            Dropping down to Line 15.

10           "And these were found in the same

11   residence that they live in."

12           "They" would be Mr. Burns; his wife,

13   who's in the courtroom, and their two

14   children.

15           Answer:  "That's correct."

16           That fact was important to Judge

17   Ballou.  Turning to his ruling on Page 25,

18   what he says is, and I'm quoting again:  "The

19   allegation that I believe that frankly carry

20   the day for me, are the fact that you live at

21   home with your two young daughters; there are

22   needles that are found in your house; and

23   there's no reason, no evidence, as to why

24   needles should be in your house at this point

25   in time."

1          So, Investigator Cook testified that,

2     pursuant to the execution of the search

3     warrant, needles were found in the house.  And

4     Judge Ballou found that fact to believe

5     dispositive.

6          The problem with that fact is, it was

7     never true.  It was never true.  There were no

8     needles found in the house.  There will be

9     some evidence of that today.

10          But if you look at the search

11     inventory, which we did not have at the last

12     hearing.  I had just been appointed to

13     represent Mr. Burns.  Turning to the

14     inventory, which is several pages back, toward

15     the end, to make a long story short, the

16     needles were found in an outbuilding.  The

17     first item in the inventory says, hypodermic

18     needle recovered under driver's seat, white

19     Mazda Miata.  In a garage, in an outbuilding,

20     there was a needle found in a car, in the

21     garage, which was separate from the house.

22          Also in that car, and this is Item 2 in

23     the inventory, one spoon with white residue

24     was found in the Miata as well, that's Item 2,

25     in the garage.

1           And flipping the page, Your Honor, to

2      Item 16, it says that multiple needles were

3      found in an outbuilding behind -- and I can't

4      read part of it -- behind something center.

5      Anyway, you had to climb a ladder.  It was up

6      on a shelf somewhere.  Some needles were found

7      as well.

8           I'll tell the Court also that on

9      cross-examination of Investigator Cook, he

10     conceded there was no heroin in the house.

11     What he described as empty bags of heroin were

12     just plastic bags.  That's what they were.

13          But that evidence was important to

14     Judge Ballou when making his ruling of --

15          THE COURT:  Let me ask you this; is

16     this just a review of Judge Ballou's ruling,

17     or is it a de novo ruling?

18          MR. GRIMES:  Yes, Your Honor, it is de

19     novo.  But I've given an opening statement

20     with the historical background.  And that

21     brings us to where we are; that brings us now

22     to the presentation of the evidence.

23          And now the Government will put on its

24     case.  But that's the opening statement, Your

25     Honor.  Thank you.

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 80-3   Filed 02/18/14   Page 14 of 91   Pageid#: 22793

Cavalier Reporting & Videography
info@cavalier-reporting.com

(800) 972-0003

1            THE COURT:  All right.  Thank you, sir.

2            MS. NEESE:  Your Honor, I'm going to

3     make an opening statement to rebut what has

4     been stated, and also present our opening as

5     to the factors under 3142 that shows that

6     Mr. Burns is a danger to society.

7            First, I'm confused by Mr. Grimes'

8     argument to begin with, the first section of

9     this with his chart that he had laid out,

10     because I think this is a detention hearing.

11     There are certain factors that need to be set

12     forth.  But he's stating things regarding

13     whether or not he was a witness at a certain

14     time in this investigation, or whether or not

15     he became a target.

16            The United States Attorney's Office, if

17     they deem someone a target, before they indict

18     them, will issue a target letter.  They do not

19     have to issue a target letter.  They will then

20     indict them and then they're notified once

21     they're arrested that they're a

22     target/defendant.

23            At the time Mr. Burns testified on

24     December 20th of 2012, this has been an

25     ongoing investigation.  We had put at least 70

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 15 of 91   Pageid#: 20793

Reproduced by Cavalier 02/18
Cavalier Reporting & Videography

(800) 972-7393
info@cavalier-reporting.com

1   witnesses into grand jury.  He was not deemed

2   a target.  He was a witness.  If you read the

3   transcript, at no point in time was he ever

4   asked about his distributions, if I remember

5   correctly.  I don't think he was asked at all

6   about his own distributions.

7        It became apparent once this went on,

8   and the investigation continued, that he was a

9   large distributor.  And he had distributed to

10  numerous individuals.  That was never asked in

11  the grand jury transcript of December 20th of

12  2012.  Not that he had to notify him at that

13  point in time, it was just --

14       THE COURT:  Well, you couldn't tell

15  him, "You're not a target," to encourage him

16  to talk about it.

17       MS. NEESE:  At that point in time, he

18  had chosen to be a confidential informant.  He

19  had been caught back in October or

20  September of 2012 with prescription medication

21  for which he didn't have prescriptions for.

22       Then he was asked by Bedford City, not

23  Bedford County, whether or not he wanted to

24  work; try to work off his charges, which were

25  state, potential state charges at the time.

1          Mr. Burns, at that time said, yeah, he

2     wanted to work.  So a Bedford City officer

3     took it to Vice in Bedford County and said,

4     "Mr. Burns would like to try to work for you."

5          At no point in time, by any of the Vice

6     Detectives, anybody from Bedford County,

7     anybody from ATF, anybody from DEA was

8     Mr. Burns ever notified that he was not going

9     to be charged either on the state level or on

10     the federal level.  He was not notified of

11     that in grand jury.  He was not notified of

12     that in any witness interviews.  And he was

13     not notified of that, at any point in time,

14     since then.

15          Then you come up to the grand jury

16     testimony.  Yes, he was notified at that time

17     that he was a witness.  But we only asked him

18     about things, whether or not he bought pills

19     and used them himself, at that point in time,

20     which does not put him in a conspiracy to

21     distribute pills.

22          Later, as we continued to find out

23     through numerous other witnesses, he was

24     actually one of the distributors.  He was one

25     injecting other people with pills, including a

(434) 293-3300
www.cavalier-reporting.com

Case 6:13-cr-00003-NKM   Document 100   Filed 02/18/14   Page 17 of 91   Pageid#: 1093

Produced by Cavalier Reporting
Cavalier Reporting & Videography

(800) 972-7993
info@cavalier-reporting.com

 1     minor, who was 16 at the time, and knowingly

 2     did that.

 3          These types of evidence that we were

 4     not privy to at the time of December 20th,

 5     does not mean that just because he wasn't

 6     notified he was a target that day, that he

 7     couldn't have testified before the grand jury.

 8     Because at that point in time, we thought he

 9     was still a cooperating, confidential

10     informant.

11          However, things, as Mr. Grimes has

12     said, changed.  Because at certain points in

13     times, we have at least two or three other

14     witnesses who've stated that Mr. Burns told

15     them, and I'm not going to quote it, but

16     basically a curse word and stated, "I'm

17     playing both sides.  I'm still doing one

18     thing; and they think I'm working for them as

19     well."

20          So at some point in time, he was cut

21     off as being a CI.  We continued to put

22     additional witnesses into grand jury.  And

23     honestly, Your Honor, at no point in time,

24     does the Government sit there and rank -- if

25     you'll look at the superceding indictment.

(431) 298-3000
www.cavalier-reporting.com

Reported by Arlene Coyle

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 18 of 91   Pageid#: 20909

Cavalier Reporting & Videography
info@cavalier-reporting.com

(800) 972-0103

1    Just because he's number 18 on the list,

2    doesn't mean that's where he stands in this

3    indictment, or where we think he is in a

4    matter of -- or role in this conspiracy.

5         Additionally, I mean, at some point in

6    time, this is going to be superceded.  So

7    there's going to be additional people.  And

8    he's not going to be the Number 18 witness.

9         So then you go to the grand jury

10   transcript of February 21st.  At no point in

11   time, was he notified what his role was.  But

12   at that point in time, he was talking about

13   another case, a methamphetamine case.  And he

14   had come in voluntarily before that, was

15   interviewed on February 8th, decided we

16   provided him with a subpoena.  And since he

17   provided information, he decided -- he came to

18   testify.  Once somebody is subpoenaed to come

19   to grand jury and testify, they come to grand

20   jury and testify.  It wasn't anything to do

21   with the current conspiracy that is alleged

22   here today.  It was regarding, for the most

23   part, at least, methamphetamine, and certain

24   other transactions regarding people that

25   haven't been charged in this indictment,

1    regarding Scotty Andrews or Jenny Kirsey (ph).

2         Additionally, Your Honor, these

3    allegations about things that were -- when he

4    was working, whether there were recordings or

5    not, if there were any recordings made between

6    Investigator Cook and Mr. Burns, by Mr. Burns,

7    they're allegedly now missing.  Just like

8    allegedly the State that was in his house is

9    missing, and the firearm that was in there,

10   and $1,800 is missing.  But the evidence

11   doesn't quite all add up.

12        When it comes down to it, after

13   everything we've put together, we, as the

14   United States Attorney's Office who makes

15   charging decisions, presented an indictment

16   with numerous witnesses who testified against

17   Mr. Burns.

18        I mean, I feel like we're here on just

19   the detention issue, but I'm talking about

20   things that, if he's trying to ask for a

21   motion to dismiss the indictment, that, I

22   think, would be a another hearing.

23        Regarding the actual conditions that

24   need to be imposed or that should go through,

25   be gone through by the Court under 3142, we

 1    submit that there's no condition or

 2    combination of conditions that would

 3    reasonably assure the safety of the community

 4    regarding Mr. Burns.  And I'm going to tell

 5    you why.  First, this is a presumption case

 6    under 3142 (e).

 7         There has already been probable cause

 8    to determine that he was part of a drug

 9    trafficking conspiracy.  And thus, once that

10    happened, the burden then shifts to the

11    defendant.

12         We also have additional evidence that

13    we're going to put forth.  And we've already

14    put forth some of that evidence before Judge

15    Ballou back on March 28th.

16         When you go through the factors under

17    3142 (g), I'm going to go through the nature

18    and the circumstance of the offense charged.

19    It was a conspiracy to distribute certain

20    controlled substances.  And it lasted at least

21    three to four years in this instance.  It

22    probably lasted longer than that.  But

23    regarding Mr. Burns, we've got that to at

24    least 2010, up until March 8th of 2013, well

25    after he knew that the federal government had

 1    already charged numerous individuals in this

 2    case.

 3          Then you've got the weight of the

 4    evidence against the defendant.  The

 5    government submits that the weight of the

 6    evidence is very strong, because after he was

 7    arrested, he waived his Miranda rights and

 8    provided a confession.  Not only did he

 9    provide a confession; we have at least eight

10    to ten or more witnesses who have testified

11    against him in grand jury, and we have a

12    recorded phone call and recorded buy, in which

13    he was aiding and abetting in the distribution

14    of Suboxone.  Yes, is Suboxone a pill that is

15    prescribed to people -- when it's prescribed

16    and used by mouth, is it something to help

17    them come off of other drugs?  Yes.  But not

18    when it's broken down, Your Honor.  Not when

19    it's broken down and either snorted or

20    injected.  It has a different effect.  An

21    effect that other drug users will tell you;

22    they're using this pill on the street to get

23    high.  So it's not the same because he wasn't

24    using it the way -- by mouth and through what

25    a doctor would lawfully prescribe in that

```
 1    situation.

 2           Additionally, you're going to look at

 3    the history and characteristics of the

 4    defendant.  His character in general.  If his

 5    wife takes the stand today, she's going to be

 6    questioned because she was questioned back on

 7    March 28th.  And she's most likely going to

 8    have to say, "Yes, he lied to her before."

 9    Numerous other witnesses have said he's lied.

10    And he's lied to the cops numerous times.

11           Additionally, he's a drug abuser, a

12    self-admitted drug abuser, and a self-admitted

13    distributor of controlled substances.

14           His employment, although he does have

15    employment and he works for himself

16    essentially, he picks and chooses when he goes

17    to work.  We've had surveillance conducted on

18    him.  We've known through other witnesses

19    who -- other defendants essentially who have

20    worked for him, that when he wants to go to

21    work, he goes to work; when he doesn't, he

22    doesn't.  So whether or not he has a full-time

23    job -- additionally, you'll see in the

24    pretrial services report, he has $18,000 in

25    child support arrearages where he hasn't been
```

(434) 293-3300       Reported by: Aileen M. Jones       (800) 972-8793
www.cavalier-reporting.com      Cavalier Reporting & Videography      info@cavalier-reporting.com

1          paying and keeping up with anything.  He's a

2          self-admitted drug user and substance abuser.

3               Additionally, right before the arrest,

4          within a week or so, he admitted, after he was

5          arrested, that he had distributed to at least

6          two other individuals, and he had used with

7          one of those individuals.

8               You're going to hear testimony that a

9          search warrant was conducted at his house and

10         in the outbuildings, and also in the vehicles

11         that were on the property, which are, I think,

12         in a garage.  But the investigator is here to

13         testify to that.

14              Now, granted, Investigator Cook was not

15         the one who conducted the search warrant.  And

16         we weren't privy at the time of the hearing to

17         what Mr. Grimes said, the actual items that

18         were seized, because it hadn't been typed up,

19         and where they were seized.  He thought, based

20         on the information he had at the time, they

21         were seized within the house.

22              The syringes were actually seized

23         within vehicles and in the outbuildings of the

24         property still close to the house, and where

25         his minor children were.  Additionally, there

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 24 of 91   Pageid#: 2086

Reported by Arlene Coyle
Cavalier Reporting & Videography

(800) 972-2595
info@cavalier-reporting.com

```
1        was a spoon with residue found in his bedroom.

2        Marijuana smoking pipe found in his bedroom.

3        It wasn't just that these items were found --

4             THE COURT:  What was the residue in the

5        spoon?

6             MS. NEESE:  Where was it?

7             THE COURT:  What was it?

8             MS. NEESE:  We do not know at this

9        time, Your Honor.  I think, at this point in

10       time, it might have been sent off to the lab,

11       but based on the baggies that had -- that we

12       had also talked about, there was not enough --

13       I think you're going to hear testimony that

14       there was not enough residue or anything left

15       to actually conduct a field test, so they have

16       to be sent off to the lab for them to be

17       determined if it was anything.

18            But regardless, I think you're going to

19       hear that, in the experience of the agent,

20       that it appeared to him to be the waxed

21       plastic baggies for heroin.  Somewhere Mr.

22       Burns had self-admitted used heroin on and off

23       since the age of 21, I think that he -- it was

24       consistent with his own statements.

25            Additionally, Your Honor, at the time
```

(434) 293-3300

www.cavalier-reporting.com

3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 25 of 91   Pageid#: 293

Reported by: Sharon C. Brice

Cavalier Reporting & Videography

(800) 972-3993

info@cavalier-reporting.com

1    that he was doing all of these activities and

2    things, he was on state probation.  I mean,

3    that's another factor that can be considered.

4    The nature and seriousness of the danger to

5    any person in the community is the last factor

6    for this Court to consider.

7         He's a self-admitted distributor for

8    pills; and had been for at least two to three

9    years.  He also -- we have recordings of him

10   distributing and aiding -- or excuse me,

11   aiding and abetting in a distribution on

12   March 8th of 2013, well after he was notified

13   that all of this was going on in the federal

14   government.  And he knew what was going on.

15   Numerous times he had known.

16        And not only that, he had already told

17   at least two other subjects that he was

18   playing both sides.  He was still doing his

19   thing on the side, but he was working for the

20   cops, too.

21        And then finally you've got -- well,

22   two other things.  You've got him injecting a

23   16-year-old with pills; not paying attention

24   that, hey, she's 16.  This shouldn't be

25   happening.  And also he's got two minor kids

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 26 of 91   Pageid#: 2089

(434) 293-3300
www.cavalier-reporting.com
Reported by Aileen M. Kidd
Cavalier Reporting & Videography
(800) 972-3809
info@cavalier-reporting.com

 1          in this house where he lives, where he,

 2          self-admitted, goes out to the outbuilding and

 3          uses illegal substances, not just pills, but

 4          also we have numerous other witnesses who have

 5          testified in grand jury that they've been over

 6          there and done these things while his family

 7          was home.

 8                    When it comes down to it, the

 9          presumption and all of the factors line in

10          favor of the Government, and we are requesting

11          that he remain detained.

12                    THE COURT:  All right.  Do you want to

13          put on evidence?

14                    MS. NEESE:  Yes, we'll put on evidence.

15                    At this point in time, we'll call

16     Deputy Joe Reynolds to the stand.

17

18                    DEPUTY JOE REYNOLDS,

19          was duly sworn and testified as follows:

20            D I R E C T   E X A M I N A T I O N

21     BY MS. NEESE:

22          Q.    Please state your name for the record,

23       and tell us how you are employed?

24          A.    I'm Deputy Reynolds; Bedford County

25       Sheriff's Office.

(434) 293-3300
www.cavalier-reporting.com
Reported by: Mike Cavallier
Cavalier Reporting & Videography
(800) 969-1993
info@cavalier-reporting.com

 1          Q.      And in your employment and position,

 2    have you had contact with Les Christopher Burns?

 3          A.      Yes, ma'am, I have.

 4          Q.      Do you know him as "Chris Burns" as

 5    well?

 6          A.      Yes, ma'am.

 7          Q.      And in your employment and position, do

 8    you work with the Vice guys very closely?

 9          A.      Yes, ma'am, I do.

10          Q.      Including Investigator Chris Cook?

11          A.      Yes, ma'am.

12          Q.      Have you actually gone out and been a

13    part of some of these drug transactions within the

14    conspiracy?

15          A.      Yes, ma'am, I have.

16          Q.      Now, if you would, please, just tell

17    us, do you know in your employment, position and

18    through your experience, how Chris Burns became a

19    confidential informant for Bedford County

20    Sheriff's Office?

21          A.      He was actually stopped by Officer

22    Dryden (ph) of the Bedford Police Department.  He

23    found some -- principally, I'm not exactly sure.

24    I know it was stuff that was illegal that he could

25    be charged criminally with inside of his car.  And

1    she, in turn, notified Bedford County because most

2    of the work that he could do was inside of Bedford

3    County.

4         Q.     Now, did he indicate, at that point in

5    time, that he wanted to try to cooperate to

6    potentially help himself out?

7         A.     Yes, ma'am.

8         Q.     Have you talked to Officer Dryden or

9    any other people that were with the Bedford County

10   Sheriff's Office that -- have they stated to you

11   whether or not he was ever told he wouldn't be

12   charged either on the state level or the federal

13   level?

14        A.     No.  I think he was just encouraged to

15   cooperate.

16        Q.     Was he ever told that he wouldn't be

17   charged with anything?

18        A.     Not to my knowledge, no, ma'am.

19        Q.     Now, when going to when Mr. Burns

20   started working, who was he assigned to?

21        A.     Investigator Cook.

22        Q.     Was Investigator Cook always by himself

23   with Mr. Burns?

24        A.     No.  We normally cover deals with a

25   couple of different people.

1    Q.      And why is that typically?

2    A.      The main reason is just officer safety.

3    And also, believe it or not, we take a lot of

4    interest in keeping our informants safe.  So if

5    they get into a bad situation, we want to be able

6    to apply the necessary force to extract them from

7    it.

8    Q.      Did Mr. Burns actually act as a

9    confidential informant and make controlled buys?

10   A.      It's my understanding he did, yes,

11   ma'am.

12   Q.      And that was regarding the Bedford City

13   stop?

14   A.      Yes, ma'am.

15   Q.      Now, was there a point in time, I

16   guess, that the relationship started dissolving

17   between Mr. Burns and the Bedford County Office?

18   A.      Yeah.  I think -- I don't know all the

19   details of what caused it to deteriorate, but I

20   know traditionally when you get -- we have

21   equipment that we use.  And we're pretty familiar

22   with how it's used.

23          And when stuff suddenly starts turning

24   off magically, you know, recordings are turned

25   off; or in this case, the recording device, the

Case 6:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 30 of 91   Pageid#: 293

(434) 293-3300   Reported by Valerie L. Tisdale   (800) 203-9093
www.cavalier-reporting.com   Cavalier Reporting & Videography   info@cavalier-reporting.com

```
 1    digital recording device, the SD card that was
 2    inside of it had been removed during a drug
 3    transaction, which is -- I mean, you have to do --
 4    it's not like it falls out or anything like that.
 5    You have to remove it.
 6         Q.    So was it concerning to your all's
 7    office?
 8         A.    Yes.  It's concerning when they do
 9    that.  And it's also concerning when we have
10    information.  Because we don't always go on what
11    one person says.  We work multiple informants and
12    collect multiple pieces of information that ties
13    stuff together.  And it became fairly obvious that
14    Mr. Burns was doing -- you know, he was trying --
15    we call it the "Lord's work."  He was doing the
16    Lord's work as a confidential informant, but he
17    was also doing work to benefit himself, which was
18    involving himself in drug transactions.
19         Q.    Outside of being under the officer's
20    control?
21         A.    Yeah.
22         Q.    And let me ask you this; in our
23    investigation, after December 20th of 2012, were
24    multiple witnesses called to grand jury, and start
25    to bring out Mr. Burns' name?
```

(434) 293-3300
www.cavalier-reporting.com
Reported by Arlene Count
Cavalier Reporting & Videography
(800) 972-3376
info@cavalier-reporting.com

```
 1        A.      Yes, ma'am.

 2        Q.      As being a distributor of pills?

 3        A.      Right.

 4        Q.      And did they state anything about a man

 5   named Jonathan Bohon?

 6        A.      Yeah.  We have -- right now we have

 7   three active overdose deaths.  And Mr. Bohon is

 8   one of those.  He's fairly -- he's in his 20s, and

 9   overdosed.  He was found deceased.

10        Q.      Did any witnesses state whether or not

11   Mr. Burns had actually shot him up the day before?

12        A.      I think from what I've read with the

13   interview with Investigator Cook, Mr. Burns

14   actually admitted that Mr. Bohon was, I guess, so

15   out of it, he wasn't actually able to inject

16   himself.  And as a result, Mr. Burns injected him.

17   And that was, from his interview on the 27th, when

18   he was arrested.

19        Q.      And even before that, before he was

20   ever arrested, did other witnesses also lead us to

21   Mr. Burns and Mr. Bohon being together that day?

22        A.      Yeah, there were several people there

23   abusing the prescription narcotics and injecting

24   them.  Yeah, they identified Mr. Burns as being

25   there.
```

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 32 of 91   Pageid#: 209

Reported by Rhonda O. Hodge
Cavalier Reporting & Videography

(800) 972-4463
info@cavalier-reporting.com

1    Q.    Were there other witnesses, including a

2    16-year-old minor that were interviewed?

3    A.    Yes, ma'am.

4    Q.    Did they provide grand jury testimony,

5    including that minor?

6    A.    Yeah, they did.  And they said that he

7    actually injected her.  I think for me, in my

8    experience, I think one of the most troubling

9    things about it was he actually took pleasure in

10   that, in making the comment that he "popped her

11   cherry" by injecting her the first time.  And

12   that, to me, was a problem.

13   Q.    And regarding Mr. Burns, did you

14   also -- during this investigation, were other

15   people questioned about whether he was playing

16   both sides of the fence?

17   A.    Yes, ma'am.  They actually -- we had

18   people coming forward and telling us that.

19   Q.    And did at least two of those testify

20   in grand jury?

21   A.    They did.

22   Q.    And who were those?

23   A.    I believe -- I don't have their names

24   in front of me.

25   Q.    Was one Amanda McKinney?  Have you

(434) 293-3300          Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 33 of 91   Pageid#: 20593          (800) 972-3301
www.cavalier-reporting.com                        Reported by Falena Cooper                              info@cavalier-reporting.com
                                               Cavalier Reporting & Videography

 1    spoken with her?

 2          A.    Yeah, we spoke to Amanda McKinney.

 3          Q.    Was another one Scotty Andrews?

 4          A.    Scott Andrews, yes, ma'am.

 5          Q.    Was there a point in time on

 6    February 8th of 2013, that Mr. Burns was

 7    interviewed at the Bedford County Sheriff's

 8    Department?

 9          A.    I'm sorry.  Say that again.

10          Q.    On February 8th of 2013, did

11    Investigator Cook and Investigator Young interview

12    Chris Burns at the Sheriff's Department?

13          A.    Yes, ma'am.

14          Q.    And at that point in time, was he asked

15    to make a recorded phone call to Scotty Andrews?

16          A.    He was.

17          Q.    And what did Scotty Andrews say

18    regarding that recorded phone call?

19          A.    He said that he was -- they had

20    basically worked together and talked about it

21    ahead of time.

22          Q.    For Scotty not to say anything?

23          A.    Right.

24          Q.    Did that concern the Bedford County

25    Sheriff's Department?

```
 1      A.      Well, obviously when you've got two

 2   people working together to mislead us, it was

 3   concerning, yes, ma'am.

 4      Q.      Was Scotty Andrews working as a

 5   confidential informant?

 6      A.      I -- no, I mean, I think he was a

 7   witness.

 8      Q.      I mean, he was somebody that we were

 9   looking at, correct?

10      A.      Yeah, he was a target that we were

11   looking at.

12      Q.      Now, going to March 8th of 2013, were

13   you a part of that?

14      A.      No, ma'am.

15      Q.      Who all was a part of that?  Do you

16   know, was Investigator Cook?

17      A.      Investigator Cook.

18      Q.      And others?

19      A.      And other officers, yes, ma'am.

20      Q.      And what exactly happened?

21      A.      My understanding, they set up a control

22   buy, which basically the control buy, they get

23   with a person that's going to make the telephone

24   call.  They made a recorded phone call.  CI called

25   Burns.  Burns actually sent another individual to
```

(434) 293-3300
www.cavalier-reporting.com

Recorded by Cavalier Reporting
Cavalier Reporting & Videography

(800) 972-3376
info@cavalier-reporting.com

```
 1    make the delivery.  But during the recorded phone

 2    call, the CI in the verbal transaction, they

 3    said -- they told Mr. Burns they appreciated him

 4    setting the deal up for them.

 5         Q.     And was the deal actually conducted?

 6         A.     It was.

 7         Q.     Was the phone call recorded?

 8         A.     It was.

 9         Q.     Was the deal recorded?

10         A.     It was.

11         Q.     And then, after that point in time, was

12    that charge included as one of the substantive

13    counts within the indictment?

14         A.     It was.

15         Q.     Regarding the superceding indictment,

16    did you all conduct arrests following it?

17         A.     Are you talking about on the 27th?

18         Q.     Yes.

19         A.     Yes, we did.

20         Q.     And was one of those individuals

21    arrested Mr. Burns?

22         A.     It was.

23         Q.     Did he waive his rights and -- or was

24    he provided with his Miranda rights?

25         A.     He was, by Investigator Cook.
```

(434) 293-3300
www.cavalier-reporting.com
Cavalier Reporting & Videography
info@cavalier-reporting.com
(800) 972-4014

1      Q.      Did he waive his rights?

2      A.      He did.  He actually was the one

3    that -- kind of two things going on at that time.

4    One was the state search warrant in reference to

5    his insurance fraud.  We actually had an informant

6    come forward and say that he bragged about the

7    fact that he had said that the stuff was stolen,

8    filed a police report.  And then they were able to

9    give us details about -- they said he was behind

10   on his bills, how he spent the money and how he

11   actually bought some heroin with it later.

12     Q.      And was that insurance fraud related to

13   our case in any way?

14     A.      No.  The only thing that I was

15   interested in and the reason I wrote the search

16   warrant is he, obviously, is a convicted felon.  I

17   mean, we were looking at him as a possible

18   defendant in the federal case.  And obviously, he

19   said the file was stolen.  And we wanted to see if

20   he filed the false report and left the gun still

21   in the house.

22     Q.      That's a state search warrant,

23   unrelated to this case?

24     A.      That's correct.

25     Q.      Now, at the time he was arrested, what

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 37 of 91   Pageid#: 2099

Reported by Arlene O'Neill
Cavalier Reporting & Videography

(800) 972-3376
info@cavalier-reporting.com

```
 1    was your role?

 2         A.    I actually secured the search warrant

 3    and executed the search warrant at the house.

 4         Q.    And were other individuals with you?

 5         A.    There were.

 6         Q.    And then what was Investigator Cook's

 7    role?

 8         A.    He actually went back with Mr. Burns

 9    and interviewed him at the Sheriff's Office.

10         Q.    So he advised him of his rights?

11         A.    Right.

12         Q.    And Mr. Burns waived his rights,

13    correct?

14         A.    Yes, ma'am.

15         Q.    And I know you already testified about

16    that.  Sorry.

17               What did Mr. Burns state during his

18    interview?

19         A.    He stated a lot of stuff.  What do you

20    want me to talk about?

21         Q.    Was it a lengthy interview?

22         A.    It was.

23         Q.    Did he admit to being a drug user?

24         A.    He did.

25         Q.    For how long, approximately?
```

(434) 293-3300
www.cavalier-reporting.com
Reported by Aileen O. Burk
Cavalier Reporting & Videography
(800) 972-0093
info@cavalier-reporting.com

1    A.    Since he was 21.

2    Q.    Was that approximately ten years or so?

3    A.    (Witness nods head.)

4    Q.    Did he admit that he had dealings with

5    Bryant Reynolds?

6    A.    He did.

7    Q.    Did he admit he had dealings with

8    Scotty Andrews?

9    A.    He did.  He said he bought about 50

10   times from him.

11   Q.    Did he also admit that he was a

12   distributor of pills?

13   A.    Yes, ma'am.  I think he provided us a

14   list of people he sold to.  I think it was ten

15   people.

16   Q.    Okay.  And would you go through some of

17   those people?

18   A.    It's Kevin Jesse, who was there when

19   Bohon died, just to give you a little perspective.

20   Scotty Andrews; Brandon Turpin, who was also there

21   when Mr. Bohon died; Amanda McKinney; Jesse

22   Kirsey; Jenny Kirsey; Matt Giles; Tim Goodman.

23   Q.    Did any of those individuals, have they

24   now either cooperated and/or testified against Mr.

25   Burns?

```
 1        A.      They have.

 2        Q.      Did Mr. Burns make any statements about

 3   injecting anyone with pills?

 4        A.      He actually said he injected another

 5   person we weren't aware of, which was Amanda

 6   McKinney.

 7        Q.      Actually --

 8        A.      And actually went into detail about

 9   Mr. Bohon.  He actually -- and that's a key thing

10   that we look at when we interview people is the

11   detail they can provide.  And he provided a lot of

12   detail as far as where his whereabouts were.  He

13   was in Blacksburg.  He said Bohon -- and just laid

14   the groundwork as far as exactly what happened.

15   It wasn't like a random statement, "Hey, I

16   injected Bohon."  He knew exactly what happened,

17   which we verified by other witnesses.

18              So he -- based on what he told us, it's

19   consistent with what other people told us the

20   night -- the night and into the morning.

21        Q.      And just to give the Court some

22   perspective; was it the summer of 2011 when

23   Mr. Bohon passed away?

24        A.      Yes, it was.

25        Q.      And at the time that Mr. Burns was
```

1    interviewed on March 28th of 2013, was he still in

2    the distribution network?

3         A.    He was.

4         Q.    What statements did Mr. Burns make

5    regarding distribution within the last couple of

6    weeks prior to his arrest?

7         A.    He actually listed two people that we

8    had dealt with in the past; a Matt Giles, and a

9    girl that he knows named Gretchen.  And he said

10   that he had sold to them in the past couple of

11   days.

12              Interestingly enough, the morning of

13   the search warrant, Matt Giles drove by the house,

14   and we got out and talked to him.

15        Q.    Also, what types of controlled

16   substances was it that he had distributed to them

17   within the past few weeks before?

18        A.    He said he got Suboxone from Heather

19   Overstreet.

20        Q.    And had distributed it to Matt Giles

21   and Gretchen?

22        A.    Right.  It says "Gretchen Fielder," but

23   I think her name is Gretchen Staton.

24        Q.    Are both Matt Giles and Gretchen Staton

25   individuals that have testified in grand jury?

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 41 of 91   Pageid#: 209
Reproduced by Cavalier Reporting
Cavalier Reporting & Videography

(800) 972-1793
info@cavalier-reporting.com

```
 1        A.      They are.

 2        Q.      Now, regarding the state search warrant

 3   that you conducted --

 4        A.      Okay.

 5        Q.      -- will you inform the Court what you

 6   found?

 7        A.      I can go through it.

 8                The search warrant at his -- 414 West

 9   Franklin Street, in Bedford City, we executed

10   approximately 7:30.  The first item we found was a

11   hypodermic needle, which was under the driver's

12   seat of a white Mazda Miata that was parked in the

13   garage.  There was also a spoon with residue

14   underneath it.

15        Q.      Now, did you field test the spoon?

16        A.      No, we didn't.  We traditionally send

17   the whole thing off.  It's all -- it's not -- it's

18   really difficult to test stuff like that, because

19   it's all -- I call it "crumbly."  I know that's

20   not a proper term, but it crumbles.  It's not real

21   easy to test.

22        Q.      And tell the Court why, because I

23   mean -- how long have you been employed with the

24   Bedford County Sheriff's Department?

25        A.      Since 2006.
```

```
 1          Q.     And --

 2          A.     No, 1996.  Time flies when you're

 3    having fun.

 4          Q.     And also, how long were you actually an

 5    ATF Task Force Officer?

 6          A.     I think three years.

 7          Q.     And then did you work in Vice as well?

 8          A.     I did.

 9          Q.     So have you been doing drug

10    investigations for a long time?

11          A.     Too long, yes, ma'am.

12          Q.     And with your training and experience,

13    would you please tell the Court why you don't

14    field test things sometimes?

15          A.     The reason we don't field test,

16    particularly in spoons and things like that, is we

17    prefer packaging them as is, which gives the lab

18    more opportunity and more substance to actually

19    test.

20          Q.     Is the lab typically something that is

21    more -- you rely upon the result of the lab more

22    than you would a field test?

23          A.     Absolutely.  That's what we can take to

24    court.

25          Q.     Lab analysis?
```

(434) 293-3300
www.cavalier-reporting.com

Reported by Jillene Cutright
Cavalier Reporting & Videography

(800) 972-3060
info@cavalier-reporting.com

Case 6:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 43 of 91   Pageid#: 2405

```
 1          A.      Lab analysis.

 2          Q.      Now, going on to Number 16 and Number

 3      20 and Number 22, will you also inform the Court

 4      what else was found?

 5          A.      All right.  Number 16, there were

 6      multiple needles.  Again, that's the garage

 7      outbuilding.  And it was behind the entertainment

 8      center.

 9                  You said 17?

10          Q.      No, 16 -- I'm sorry.  Number 19, 20 and

11      22.

12          A.      All right.  In the bedroom, we found a

13      pill container that had an actual marijuana

14      smoking device.  Also found a metal spoon with

15      residue.

16          Q.      And where was that metal spoon with

17      residue found?

18          A.      Inside the bedroom.

19          Q.      And when you say, "the bedroom," whose

20      bedroom?

21          A.      Based on what we found in there, the

22      clothing and things like that, it looked like Mr.

23      Burns and his wife.

24          Q.      So it appeared to be the master bedroom

25      of the house?
```

```
 1        A.      Right.  There were male and female

 2   clothes.

 3        Q.      Were there other individuals in that

 4   house?

 5        A.      There were --

 6        Q.      Two minors?

 7        A.      Yeah, children, like small children.

 8        Q.      What about Number 22?

 9        A.      Twenty-two is the cellophane wrapper

10   that had been melted.  It had four round pills.

11   It was in the bedroom as well.

12        Q.      Was that in a prescription bottle?

13        A.      No, it was not.

14        Q.      Do you know what those pills are at

15   this time?

16        A.      I do not.  We sent those to the lab,

17   too.

18        Q.      Now please go to Number 27 and Number

19   28.

20        A.      Okay.  Twenty-seven, I noted was empty

21   heroin bags in the front seat of the pickup.

22        Q.      And I'm going to stop you there

23   because -- let's talk about he empty heroin bags.

24                Why did you put on here, empty heroin

25   bags?
```

(430)298-3001
www.cavalier-reporting.com

Reported by Arlene Coyle
Cavalier Reporting & Videography

(800) 231-9760
info@cavalier-reporting.com

```
 1        A.       Just based on the experience that I've

 2    had, it was -- they were consistent with the way

 3    heroin is packaged.

 4        Q.       Which is what?

 5        A.       Basically what they do, the best way to

 6    put it is if you take a BC powder, the way the BC

 7    powder is done and cut it in about a half, they'll

 8    actually make their own bags.

 9              These were actually, like, a light blue

10    color.  But they're small.  The best way to

11    describe it is, once you see a baggy that has

12    heroin in it, it's kind of -- it's consistent.  I

13    guess, the best way to give you perspective is,

14    I've probably seen 100, 150 cases of heroin that

15    I've worked.  And every single time that I've

16    identified it as something that contained heroin,

17    sure enough it was.

18              In this case, it's even further by the

19    fact that I had the informer saying that he took

20    the money that he got from the insurance

21    settlement, and bought heroin with it.

22        Q.       Did you also have admissions from Mr.

23    Burns that he's a heroin user?

24        A.       Yes, ma'am.

25        Q.       Now, did you field test those heroin
```

(434)293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 46 of 91   Pageid#: 272

Reported by Pam Childress
Cavalier Reporting & Videography

(800) 972-0203
info@cavalier-reporting.com

1    bags?

2         A.    No.  Again, we sent them to the lab.

3         Q.    And why didn't you field test them?

4    Were they empty?

5         A.    They were -- yeah, there was no

6    quantity inside of it.  So we sent them all.  We

7    packaged them altogether, with the hopes that the

8    lab would be able to extract the substance out,

9    and identify it.

10        Q.    And what about Number 28?

11        A.    Twenty-eight, is a pill bottle with

12   marijuana seeds that was found in the bedroom.

13        Q.    And also, what about -- just explain to

14   the Court the residence, and how everything is set

15   up?  Are they close in proximity?

16        A.    To the children's room?

17        Q.    The outbuilding, the -- I mean, they're

18   all on the same property?

19        A.    Yeah.  I mean, it's probably from their

20   front door -- I guess to give you perceptive, it

21   was a pickup truck that was parked in the

22   driveway.

23             If you are at the back of the pickup,

24   if you go out the front door at the back of the

25   pickup, the front of the truck would be at the

```
 1      front of the garage.  So about the length of the
 2      truck from door to door on those buildings.
 3             Q.     So not very far?
 4             A.     No.
 5             Q.     Is this like a mansion?
 6             A.     No, far from it.
 7             Q.     And would it be safe to say that the
 8      children are in this house on a full-time basis?
 9             A.     It would.
10             MS. NEESE:  No further questions at
11         this time, Your Honor.
12             THE COURT:  All right.
13
14         C R O S S - E X A M I N A T I O N
15   BY MR. GRIMES:
16         Q.     Deputy Reynolds, good morning, sir.
17         A.     Good morning, sir.
18         Q.     I believe I may have talked with you
19      the other day about this case by telephone.
20         A.     Yes.
21         Q.     If my memory serves.
22         A.     Yes.  I apologize, yes, sir.
23         Q.     So you wrote the search warrant, which
24      is Exhibit 6.  And do you have that before you?
25             A.     I don't.  I think the Government has
```

(434) 293-3300
www.cavalier-reporting.com
Reported by Ferrell  Quinn
Cavalier Reporting & Videography
(800) 972-1093
info@cavalier-reporting.com

1    it.

2         Q.    All right.  Let me show you my copy

3    here.

4         A.    Okay.

5         Q.    Here's the search warrant.  And for the

6    record, I'm on the first page of Exhibit 6, Your

7    Honor.

8              This search warrant was written on

9    March 26, 2013.  And the subject of the search

10   is -- concerns obtaining money by false pretenses.

11   And there's a statute cited, Code of Virginia,

12   Section 18.2 -- I can't read the numbers, sir.

13        A.    It's 18.2-178.

14        Q.    All right.  So you wrote the search

15   warrant to look for evidence of a crime of

16   obtaining money by false pretenses, correct?

17        A.    Correct.

18        Q.    All right, sir.  And you wrote that

19   search warrant five days after Mr. Burns had been

20   indicted by the federal court grand jury, correct,

21   sir?

22        A.    That's correct.

23        Q.    All right.  And was that one way of

24   getting around the federal government complying

25   with the Federal Rules of Criminal Procedure,

(434)238-3871
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 49 of 91   Pageid#: 271

Reported by Falone Corvil
Cavalier Reporting & Videography

(800) 972-1993
info@cavalier-reporting.com

1      through the Federal Rules of Criminal Discovery,

2      having the State issue the search warrant to look

3      for evidence of obtaining money by false

4      pretenses?

5          A.      I'm not really sure what that -- I

6      mean, you're telling me something, not asking me a

7      question.

8          Q.      I was asking you a question.  I was

9      asking a question.

10              You knew that Mr. Burns had been

11     indicted on or about March 21, 2013 by the federal

12     grand jury, correct?

13         A.      Correct.

14         Q.      And when you interrogated Mr. Burns,

15     about the time of executing the search warrant,

16     how much time did you spend talking with him?

17         A.      You said when I interrogated him?

18         Q.      Whoever, whoever interrogated him.  You

19     were reading from notes there earlier, sir.

20         A.      Right.  I didn't interrogate anybody.

21     I interviewed somebody.

22         Q.      Interviewed Mr. Burns.  Okay.

23              You've interviewed Mr. Burns, and you

24     spent about how much time interviewing him?

25         A.      I meant, I talked to him for a brief

(434)295-3900
www.cavalier-reporting.com
Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 50 of 91   Pageid#: 2121
Reported by Valerie L. Disney
Cavalier Reporting & Videography
(800) 972-1993
info@cavalier-reporting.com

1    period.

2        Q.    A brief period of time.  And you asked

3    him a lot of questions about drug distribution and

4    use, didn't you?

5        A.    No.  My concern was the Walker .22

6    caliber pistol, which I noted the serial number.

7        Q.    Now wait a minute.  On direct

8    examination, didn't the United States ask you

9    whether you asked Mr. Burns about drug use and

10   distribution?

11       A.    I think they asked me if anyone from

12   the government had asked him about that.  I was

13   referring -- the information I provided there was

14   Investigator Cook interviewed him.

15       Q.    When was Mr. Burns charged by the

16   Bedford authorities with obtaining money by false

17   pretenses?

18       A.    He wasn't.  This was an investigative

19   search warrant.

20       Q.    So now you're telling the Court that

21   he's never been charged with obtaining money by

22   false pretenses, correct, sir?

23       A.    I'm saying that we wrote the search

24   warrant for obtaining money by false pretense.

25       Q.    Are you also saying Mr. Burns has never

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 51 of 91   Pageid#: 263
Reported by Teresa Q. Harvey
Cavalier Reporting & Videography

1    been charged with obtaining money by false

2    pretenses?

3         A.    I don't have his criminal history.  So

4    if you're asking me, has he ever been charged, I

5    don't know.

6         Q.    Sir --

7         A.    I know that we had an investigation in

8    reference to insurance fraud.  The information

9    came to me through interviewing witnesses.  And

10   that's what the search warrant was written for.

11        Q.    Has Mr. Burns been charged, as a result

12   of this search, with obtaining money by false

13   pretenses?

14        A.    Not at this time.

15        Q.    And the scope of the search is defined

16   here.  Did you write this?

17        A.    I did.

18        Q.    You were looking for a pistol, a

19   fireproof safe, digital storage media, a personal

20   check for $5,700 made payable to Remodeling USA

21   financial records and Social Security cards

22   belonging to Tara Burns and Les Burns, correct?

23        A.    That's correct.

24        Q.    And with those items you see drug

25   paraphernalia, didn't you?

```
 1          A.      Yeah, we're not allowed to leave
 2   contraband in the house.   It's against the law.
 3          Q.      I see.   But Item 16 on your
 4   inventory -- do you have your inventory or did I
 5   take it?
 6          A.      I've got it right here.
 7          Q.      Item 16 on the inventory says that
 8   multiple needles were found in the outbuilding
 9   behind the entertainment center?
10          A.      Correct.
11          Q.      What did you have to do to get to them?
12          A.      What do you mean, "to get to them?"
13          Q.      Well, "behind the entertainment
14   center," the entertainment center is in the
15   garage?
16          A.      Right.
17          Q.      What did you have to do to get to the
18   needles?
19          A.      We had to crawl back there and get
20   them.
21          Q.      Crawl back behind the entertainment
22   center?
23          A.      Uh-huh.
24          Q.      And then were they on the floor?
25          A.      I mean, they were behind the
```

1    entertainment center.

2         Q.    Laying on the floor; taped to the wall;

3    in a cabinet; in a book shelf or where?  And if

4    you don't know, just says, "I don't know?"

5         A.    I mean, my notes say they were behind

6    the entertainment center.  That's all I know.

7         Q.    What's the source of your information?

8         A.    I wrote it.  When people recover it, we

9    record it.  And that's what happened.

10        Q.    Oh, got you.  So they weren't in plain

11   view?

12        A.    No, sir.

13        Q.    But they were seized anyway, correct?

14        A.    Yes, sir.  We can't leave contraband.

15        Q.    I see.  All right.  Now, who was with

16   you during the search?

17        A.    It was myself, Officer Dryden.  I think

18   a couple of the agents that assisted in the arrest

19   were there for a certain period of time.

20        Q.    What are their names?

21        A.    Special Agent Davidson, Russell

22   Davidson.

23        Q.    Special Agent with what authority?

24        A.    Alcohol, Tobacco and Firearms, ATF.

25        Q.    A federal agency, correct?

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 54 of 91   Pageid#: 2121693

Recorded by Cavalier 02/18
Cavalier Reporting & Videography

(800) 972-1693
info@cavalier-reporting.com

```
1        A.      That's correct.

2        Q.      Who else?

3        A.      And then Officer Dryden from the City

4   Police Department.

5        Q.      You said a couple of special agents.

6   Who was the other special agent?

7        A.      I think -- I don't know his full name.

8   He goes by "Lucky."

9        Q.      Who's he with, AFT or DEA?

10       A.      ATF.

11       Q.      Who invited the federal agents to

12  participate in the state search for evidence of

13  obtaining money by false pretenses?

14       A.      Who invited them?

15       Q.      Yes.  How did they know to be there?

16       A.      We picked them up on federal charges,

17  and that's why the federal agents were there.

18       Q.      You picked who up on federal charges?

19       A.      Mr. Burns.  We arrested them.  They

20  were there.  We traditionally work well with each

21  other.  They assisted us in the search.

22       Q.      So this was a joint arrest involving

23  state and federal authorities --

24       A.      Correct.

25       Q.      -- while an indictment was pending
```

(434) 293-3300
www.cavalier-reporting.com
Case 3:13-cr-00003-NKM   Document 100   Filed 02/18/14   Page 55 of 91   Pageid#: 293
Reported by Tanner O'Hara
Cavalier Reporting & Videography
(800) 972-1993
info@cavalier-reporting.com

```
1    against Mr. Burns in federal court?

2         A.    The indictment wasn't pending.  It was

3    being searched.

4         Q.    Sir, the indictment was filed March 21,

5    2013.  Do I need to show it to you?

6         A.    No.

7         Q.    The United States Attorney just asked

8    you about Item 28 on your inventory.

9         A.    Correct.

10        Q.    Sir, I don't even have an Item 28.  If

11   the Court will look at Exhibit 6, it just goes to

12   27.

13        A.    Okay.

14        Q.    When was Item 28 added to the

15   inventory?

16        A.    I guess it was after we dropped that

17   copy off.  But I know it's on the certified

18   return, if you want to see that.

19        Q.    When was Item 28 added to the

20   inventory, and who added it?

21        A.    I added it.

22        Q.    When did you do that?

23        A.    At his house, when we served the search

24   warrant.

25        Q.    What is Item 28?
```

(434)293-3300
www.cavalier-reporting.com
Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 56 of 91   Pageid#: 271
Reproduced by Cavalier Reporting
Cavalier Reporting & Videography
(800) 972-1993
info@cavalier-reporting.com

1    A.    Filled bottle with marijuana seeds.  It

2    was recovered in the bedroom.

3    Q.    When did you form the intent to add

4    Item 28 to the search warrant -- search warrant

5    return?

6    A.    Formed the intent to do?

7    Q.    When did you decide to add Item 28?

8    When did you say, "I've already added 27 things.

9    I need to add one more?"

10    A.    If you're trying to say that I just

11    added something on a whim, I added it at the

12    house.  We have a four copy return.  Okay?  Three

13    pieces of paperwork on these inventory lists.

14    Okay?  I left two copies at that house.  Okay?

15    When I filled out the return, and when

16    I have my inventory list right here, that looks

17    just like yours, except it has an Item 28, I

18    filled it out at the house.

19    Q.    Did you leave at the house, and you're

20    talking about the Burns' house, this inventory,

21    which only had 27 items on it?

22    A.    Yes, I did.

23    Q.    And later you added Item 28, correct?

24    A.    This -- the official return shows Item

25    28 added.  My list has Item 28 on it.

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 57 of 91   Pageid#: 271

Reported by Aileen O'Grady
Cavalier Reporting & Videography

(800) 972-1993
info@cavalier-reporting.com

1      Q.      Let me go back to the questioning from

2   the United States Attorney about the events of

3   March 8, 2013, which for the record is Count 22 of

4   the superceding indictment, the alleged

5   distribution of Suboxone, a Scheduled 3 controlled

6   substance.

7           What's the quantity of drugs involved

8   in that particular transaction?

9      A.      I wasn't there, and I don't know.

10      Q.      You don't know?

11      A.      I don't.

12      Q.      If Investigator Cook testified under

13   oath on March 28, 2013, that two to three pills of

14   Suboxone was involved, do you have any reason to

15   disagree with that testimony?

16      A.      No, sir.

17      Q.      All right.  Now, let me ask you about

18   this 16-year-old minor you've been talking about.

19   Her name is Samantha.  I won't use the last name.

20   Is it?

21      A.      It is.

22      Q.      And her parents are two of the people

23   charged as codefendants in the superceding

24   indictment filed by the United States, aren't

25   they?

```
 1        A.      It is.

 2        Q.      What are their name?

 3        A.      It's George Lentz (ph).

 4        Q.      And?  How about Dana Michelle Parker?

 5        A.      Dana Parker, yes.

 6        Q.      They're the parents of the 16-year-old

 7   you're telling us about, correct?

 8        A.      That's correct.

 9        Q.      And Dana Parker and George Lentz are

10   both drug dealers, aren't they?

11        A.      Yes, sir, they are.  But they didn't

12   inject their daughter.  Your client did.

13        Q.      You know what they did?

14        A.      Correct?

15        Q.      At all periods of time?

16        A.      I mean, I don't know everything they

17   did, but I know what they've told me and what

18   other witnesses told me.

19        Q.      Uh-huh.  And at some point in time, you

20   testified that an SD card, which is a recording

21   card, was removed from a recording device used in

22   a drug transaction; is that correct?

23        A.      Correct.

24        Q.      And that's when things went south for

25   Mr. Burns, didn't they?
```

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 59 of 91   Pageid#: 2493
(434)293-3300                Reported by Jaime C. Wright            (800) 972-2993
www.cavalier-reporting.com          Cavalier Reporting & Videography       info@cavalier-reporting.com

```
1          A.     Well, I think that was one of the

2     contributing factors, yes, sir.

3                 MR. GRIMES:  Nothing further, Your

4          Honor.

5                 THE COURT:  Okay.

6                 MS. NEESE:  Briefly, Your Honor.

7

8          R E D I R E C T   E X A M I N A T I O N

9     BY MS. NEESE:

10         Q.     George Lentz is not Samantha's father,

11    is he?

12         A.     Not biological father, no.

13         Q.     They're not even married, are they?

14         A.     No, ma'am.

15         Q.     She didn't even live with them, did

16    she?

17         A.     No.

18         Q.     Did she actually have another father

19    who -- and has another set of grandparents that

20    she was residing with at the time?

21         A.     I think they lived -- yes, ma'am.

22         Q.     And Dana Parker is her mother?

23         A.     She is.

24         Q.     And she is charged?

25         A.     She is.
```

(434)293-3300
www.cavalier-reporting.com

Reported by Arlene Coleman
Cavalier Reporting & Videography

(800) 972-1993
info@cavalier-reporting.com

```
 1        Q.      And she's a self-admitted drug
 2   distributor, correct?
 3        A.      Yes, ma'am.
 4        Q.      And the 16-year-old has actually stated
 5   she's gotten pills from her mother, too, correct?
 6        A.      Yes, ma'am.
 7        Q.      Now, did the 16-year-old make any
 8   hesitation in stating who injected her with pills?
 9        A.      No, she didn't.
10        Q.      And who was that?
11        A.      Mr. Burns.
12        Q.      Now, Amanda McKinney, has she stated
13   now that she was injected with pills by Mr. Burns?
14        A.      Yes, ma'am.
15        Q.      Are her parents charged in this?
16        A.      No, ma'am.
17        Q.      Are her parents charged drugs dealers
18   in any way?
19        A.      No, ma'am.
20        Q.      What about Jonathan Bohon; were his
21   parents charged in this?
22        A.      No, ma'am.
23        Q.      Okay.  Now going back to the questions
24   that you were asked regarding whether the federal
25   government was involved in the search.  Does the
```

(434) 293-3300
www.cavalier-reporting.com

Case 6:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 61 of 91   Pageid#: 272

Reported by Alllera Comway

Cavalier Reporting & Videography

(800) 972-3993
info@cavalier-reporting.com

```
 1    federal government and the state authorities, do

 2    they work together quite frequently whether or not

 3    it's a state investigation or a federal

 4    investigation?

 5         A.     I think the federal government gets

 6    most of their cases.

 7         Q.     They get a lot of cases; is that

 8    correct?

 9         A.     Yes, ma'am.

10         Q.     The insurance fraud, in any way, by

11    obtaining money by false pretenses, was that

12    related to this case whatsoever?

13         A.     No.

14         Q.     So, I mean, did you need to go get a

15    federal search warrant?

16         A.     No.  Like I said, the only thing I

17    wanted to do is to try to locate that firearm.

18         Q.     And in regarding once you get a search

19    warrant, and including -- were some of the things

20    you were looking for, financial records?

21         A.     Yes, ma'am.

22         Q.     A piece of paper?

23         A.     Yes, ma'am.

24         Q.     Could that have fallen behind the

25    entertainment center?
```

(434)293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 100   Filed 02/18/14   Page 62 of 91   Pageid#: 212-343

Reported by Aileen O'Brien
Cavalier Reporting & Videography

(800) 972-9703
info@cavalier-reporting.com

```
 1        A.      Yes, ma'am.

 2        Q.      Were you entitled to look anywhere

 3   where a piece of paper could have been?

 4        A.      Yes, ma'am.

 5               MS. NEESE:  No further questions, Your

 6   Honor.

 7               THE COURT:  All right.  Thank you, sir.

 8   You may step down.

 9               All right.  Any other evidence?

10               MS. NEESE:  Your Honor, we'll submit

11   the pretrial services report as written,

12   unless the defense counsel wants us to put the

13   probation officer on.

14               MR. GRIMES:  No, Your Honor.

15               THE COURT:  Okay.  We'll admit it.

16               Okay.  Mr. Grimes, do you have any

17   evidence?

18               MR. GRIMES:  Some, Your Honor, yes.

19               I'll call Gina Smith.

20

21               GINA SMITH,

22   was duly sworn and testified as follows:

23

24

25
```

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 63 of 91   Pageid#: 293

```
 1              D I R E C T    E X A M I N A T I O N

 2     BY MR. GRIMES:

 3          Q.     Ms. Smith, tell us your name?

 4          A.     Gina Kristin Smith (ph).

 5          Q.     Your last Christopher's -- you're

 6     Christopher Burns' mother?

 7          A.     I am.

 8          Q.     And he goes by "Chris?"

 9          A.     He does.

10          Q.     All right.  You have another son?

11          A.     Jonathan Burns.

12          Q.     All right.  How old is Chris, and how

13     old is your other son?

14          A.     Chris is 30, and I think my other son

15     is 28 or 29.

16          Q.     And you know your son is married to his

17     wife, who's in the courtroom.  What's her name?

18          A.     Tara Burns.

19          Q.     And they have two children?

20          A.     Yes.

21          Q.     Let me get you to maybe --

22          A.     Sorry.

23          Q.     All right.  How long have they been

24     married?

25          A.     Five or six years, I think.
```

(434)390-3800
www.cavalier-reporting.com

Reproduced by Faircup -02/18/14

Cavalier Reporting & Videography

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 64 of 91   Pageid#: 272

(800) 272-303
info@cavalier-reporting.com

```
 1        Q.     Let me ask you just a bit about your

 2   son's childhood, and his relationship with his

 3   father.  Tell the Court about that?

 4        A.     His father was mentally, physically,

 5   verbally extremely abusive.

 6        Q.     Was his father involved with drugs?

 7        A.     Yes, he was.

 8        Q.     Did his father expose Chris to drugs?

 9        A.     Yes, he did.

10        Q.     In what way?

11        A.     He would have him divvy up and

12   distribute around the age of 12, I believe, while

13   he would go to the bar next door.  And other

14   people would come over, and he would have to give

15   them the drugs.

16        Q.     And this occurred when he was a child;

17   when Chris was a child?

18        A.     It was.

19        Q.     Now, there's evidence that Chris has

20   had a multi-year problem with prescription drugs;

21   would you agree with that?

22        A.     Yes.

23        Q.     At the end of the day, do you want to

24   see him get help for his drug problem?

25        A.     Of course.
```

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 65 of 91   Pageid#: 2293

Reported by Jill Caldwell
Cavalier Reporting & Videography

(800) 972-3393
info@cavalier-reporting.com

```
 1        Q.    All right.  Is Chris a good father?

 2        A.    He is a very good father.  He loves his

 3    children.

 4              MR. GRIMES:  All right.  That's all for

 5        now.  Would you answer any questions that the

 6        United States Attorney or Judge Moon may have?

 7

 8         C R O S S - E X A M I N A T I O N

 9    BY MS. NEESE:

10        Q.    Ms. Smith, good morning.  Does it

11    concern you that your son is a self-admitted drug

12    user?

13        A.    Yes, it does.  I love him.  He's my

14    son.

15        Q.    And also, that he's distributed drugs,

16    too; does that concern you?

17        A.    Yes.

18        Q.    Even around places where your

19    grandchildren are located?

20        A.    Yes.

21        Q.    What about, he has another child, too;

22    is that correct?

23        A.    He does.

24        Q.    And where does that child live?

25        A.    Wisconsin.
```

(434) 293-3300          Reported by Farrell Cornuta          (800) 972-3993
www.cavalier-reporting.com    Cavalier Reporting & Videography    info@cavalier-reporting.com

```
 1        Q.     Wisconsin?  And does it concern you
 2   that he's behind on his child support, $18,000?
 3        A.     Yes.
 4             MS. NEESE:  No further questions, Your
 5   Honor.
 6             THE COURT:  All right.  Thank you.
 7             You may step down.  Thank you.
 8             MR. GRIMES:  No additional evidence for
 9   today's hearing.
10             THE COURT:  Okay.  You may be heard.
11             MS. NEESE:  Your Honor, just briefly, I
12   don't want to rehash everything.  But just
13   going through the conditions and why we're
14   here today, the presumption is that he should
15   be detained based on the drug trafficking
16   offense that he's charged in -- or the
17   superceding indictment that he's charged on
18   two counts, lays the burden on the defendant.
19             Additionally, there's all this other
20   evidence that we've set forth under the 3142
21   factors; and the nature and circumstances of
22   the offense charged.  It is conspiracy to
23   distribute.  He has made post-Miranda
24   admissions.  And additionally, numerous other
25   witnesses have made -- or have provided
```

(434)293-3000
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM    Document 100    Filed 02/18/14    Page 67 of 91    Pageid#: 1293

Reported by Sharon M. Davis
Cavalier Reporting & Videography

(800) 972-3376
info@cavalier-reporting.com

 1        testimony and/or statements regarding his

 2        involvement in this distribution network.

 3              The weight of the evidence, we submit,

 4        is very strong against Mr. Burns, since he did

 5        make post-Miranda admissions.  And also since

 6        he was involved in a recorded phone call on

 7        March 8, 2013.

 8              And additionally, he was involved in

 9        that transaction of Suboxone.  And that also

10        with the other witnesses who have testified.

11              Going to the history and

12        characteristics of the defendant, we would

13        note several things.  First, he is, as his

14        mother even testified, he's been someone who

15        has used drugs for a really long time.  And

16        that should be taken into consideration by the

17        Court.

18              Additionally, he is a distributor.  You

19        go to the information about his liabilities;

20        you have the child support arrearages and

21        other liabilities that he's not paying, but

22        he's able to purchase drugs on the street.

23        Additionally, you go to his own statement

24        about how he was distributing Suboxone until

25        at least a week or two before his arrest.

(434)293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 68 of 91   Pageid#: 2730

Reported by Valerie Almquist
Cavalier Reporting & Videography

(800) 972-1993
info@cavalier-reporting.com

1          You have the search warrant that was

2     executed at the house and in the outbuildings.

3     And you have numerous drug paraphernalia that

4     were found there on that day.

5          And additionally, he was on state

6     probation at the time of the offense.  And

7     it's noted in the pretrial services report, or

8     at the time of part of the offense, at least.

9          Then you go to the nature and

10    seriousness of the danger to any person in the

11    community.  And he's a distributor of pills.

12    He's injected numerous people, including a

13    16-year-old minor, with pills.  And he also

14    has children in his house.  We submit that

15    there's overwhelming evidence, and that they

16    have not overcome the burden to release Mr.

17    Burns.

18          THE COURT:  All right.

19          MR. GRIMES:  And we submit to the

20    contrary, Your Honor.

21          I'll point out two things with respect

22    to the strength of the Government's case.  In

23    due course, of course, the defense will file a

24    motion to dismiss.  The United States

25    Attorney, as an officer of the court, told

```
 1        Mr. Burns on December 20, 2012, "You are not a
 2        target of the investigation.  If you were a
 3        target of the investigation, we would notify
 4        you that you are a target of an investigation.
 5        And if you're qualified then, you receive
 6        court appointed counsel."
 7             The United States Attorney, as an
 8        officer of the court, made that representation
 9        on the record.
10             THE COURT:  Do you have evidence that
11        he was a target at that time?
12             MR. GRIMES:  Not at that time.
13             THE COURT:  If she's not telling a lie,
14        I mean, what difference does it make?  People
15        could become a target.
16             MR. GRIMES:  That's right.  And if he
17        becomes a target, then we'll let you know that
18        you're a target.  And if you're qualified,
19        then you will receive court appointed counsel.
20             We're saying he was a target at that
21        time.  He became a target, obviously later.
22        He testified on March 21, 2013, and was
23        indicted five days later.
24             So we'll file a motion to dismiss on
25        that.
```

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 70 of 91   Pageid#: 293

1          MS. NEESE:  Your Honor, I'll object to

2     that statement.  It was a month later, a month

3     and five days.

4          THE COURT:  That would go to the

5     admissibility of whatever his testimony was.

6          MR. GRIMES:  We'll address that in due

7     course.  The second thing we'll address in due

8     course, is the United States and Bedford

9     County's issuance of a search warrant

10    ostensively to look for evidence of obtaining

11    money for false pretenses --

12         THE COURT:  Was there not probable

13    cause to search for the gun that was reported

14    stolen or whatever?

15         MR. GRIMES:  We don't know that, Your

16    Honor.  That's beyond the scope of today's

17    hearing.  But under federal law --

18         THE COURT:  They had probable cause to

19    search the house.  I mean, and they conducted

20    the search with a search warrant, why is

21    that -- what's wrong with that?

22         MR. GRIMES:  Because, as we'll brief it

23    when we file the motion, Your Honor --

24         THE COURT:  But we don't have that.  So

25    I don't see how I can give any weight.  I

1    can't cast dispersions on the search if I

2    don't know that there was something wrong with

3    it.

4         MR. GRIMES:  What's wrong with it --

5         THE COURT:  The face of it is, it's

6    okay.

7         MR. GRIMES:  Well, we'll brief it in

8    due course.  But while an indictment is

9    pending, the Government can't issue a search

10   warrant, Your Honor.  They have to proceed

11   through the rules of criminal procedure, and

12   specifically, Rule 16.  We'll brief that in

13   due course for the Court.

14        But all of that goes to the strength of

15   the Government's case.  What you have here, at

16   the end of the day, is a gentleman who is a --

17   I don't know if "life-long" is the right word,

18   but since his teenage years, a user and abuser

19   of prescription drugs.

20        Now, this is not the Court's first time

21   at the rodeo, and not the first time you've

22   seen those facts.  I mean, my word, that,

23   perhaps is the most common fact pattern in

24   federal court; someone's a user of

25   prescription drugs.  And no question about

1      that whatsoever.

2             Things went south for Mr. Burns when an

3      SD card came up missing that allegedly had

4      recordings of his conversations with Officer

5      Cook or other drug transactions; that came up

6      missing.  And then they cut him loose.  They

7      cut him loose.

8             And if you look at the substantive

9      charge, in essence, there's only one count and

10     it's Count 22.  It's distribution of two or

11     three Suboxone pills, Your Honor.  That's it.

12     That's what they've got him on, and that's why

13     they indicted him in March of this year.

14            There's no evidence, insufficient

15     evidence he's a danger to society or himself.

16            THE COURT:  Well, what about the

17     evidence?  I thought other people said he

18     distributed drugs.

19            MR. GRIMES:  Other people have said

20     that for the purpose --

21            THE COURT:  What is that not evidence?

22            MR. GRIMES:  It is evidence for today's

23     hearing, Your Honor.  But that was all

24     occurring all along.  All along, Your Honor,

25     he was working as an informant distributing

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 73 of 91   Pageid#: 2359
(434) 293-3300   Cavalier Reporting & Videography   (800) 972-3343
www.cavalier-reporting.com                    info@cavalier-reporting.com

1    drugs for the Government, buying drugs for the

2    Government while working as a --

3            THE COURT:  Well, I can't find him not

4    guilty on today, can I?

5            MR. GRIMES:  No, of course not.

6            THE COURT:  I mean, I don't understand

7    how I can give much weight either way to what

8    might potentially come out at another hearing.

9            MR. GRIMES:  We agree, Your Honor.  For

10   the purpose of today's hearing, from the

11   United States or the defense, that could be

12   little more than a proffer.  I mean, that's

13   about all we can do in a bond hearing, a

14   detention hearing, if you will.

15           But what we're here for today is to ask

16   whether there are conditions of release that

17   would be appropriate; and we submit there are.

18           We ask the Court to order bond; take

19   note of the fact that many of these people who

20   are doing exactly the same thing are out on

21   bond.  The Court has permitted bond for them.

22   And we ask for bond of $25,000, secured bond;

23   home electronic monitoring, should the Court

24   feel that it's necessary; and permit him to

25   remain on bond pending.  There's no history

```
 1        that he's a flight risk, or won't show up in

 2        court.  No criminal history to speak of.

 3              And so what you have, at the end of the

 4        day, is a life-long drug user and abuser of

 5        drugs, who was dealing drugs for the

 6        Government.  So we ask for $25,000 secured

 7        bond.

 8              I point out also, and one of the

 9        reasons we appeal is Investigator Cook

10        testified the needles were found in the house.

11        They weren't.  They were in a garage.  And

12        that was the dispositive factor in Judge

13        Ballou's mind, if you read his opinion.  So

14        we've addressed that for the Court.

15              The Court's concern is continued

16        distribution of drugs.  And we submit the

17        conditions of bond could be arranged to permit

18        him to be released.  Thank you, Your Honor.

19              MS. NEESE:  Your Honor, may I?

20              THE COURT:  Yes.

21              MS. NEESE:  Regarding the search

22        warrant, Your Honor, I think it's been clear

23        on the record, we're here for a detention

24        hearing.  We're using things from the search

25        warrant for why --
```

```
 1              THE COURT:  Well, I don't think the

 2       Court can decide or should base anything on

 3       the search warrant as making any assumption

 4       that it -- a bad warrant.

 5              MS. NEESE:  Exactly, Your Honor.  We're

 6       not even asking that here today.  The only

 7       reason we're using that stuff is for him to be

 8       detained under the factors.  We're not going

 9       to charge any of those on the federal level.

10       We had no say in what a state magistrate

11       issues, and what he doesn't issue.  In fact,

12       it's not even related to our case whatsoever.

13       I don't intend, at any point in time, to

14       charge anything regarding the things that were

15       found.

16              What we're using that for is why he

17       should be detained today, and the factors --

18              THE COURT:  Was the gun found?

19              MS. NEESE:  The gun has not been found,

20       Your Honor.  And, in fact, if his wife would

21       have taken the stand today, she also made

22       admissions on that day.  And I won't proffer

23       those admissions at this point in time.  But

24       it has not been found.

25              Now we're talking about a conspiracy
```

(434) 293-3300
www.cavalier-reporting.com
Reported by: Sharon L. Dunn
Cavalier Reporting & Videography
(800) 972-3393
info@cavalier-reporting.com

```
 1        case as well.  He's only pointing out that,
 2        yes, on March 8th of 2013, a couple of
 3        Suboxone pills.  That doesn't include all the
 4        admissions he's made and the numerous other
 5        witnesses that have testified he's been
 6        distributing drugs for a certain period of
 7        time for at least two to three years.  One
 8        date is just a substantive offense.  A
 9        conspiracy encompasses three to four years of
10        this ongoing activity by this distribution
11        network in Bedford.
12              Additionally you've heard evidence that
13        he was playing both sides.  He was basically
14        going and not distributing drugs for the
15        Government, but he was actually purchasing
16        drugs for the Government with controls in
17        place.  And then he was distributing on the
18        side.  And he told at least two witnesses,
19        Amanda McKinney and Scotty Andrews, "Hey, this
20        is what I'm going to do, and this is how I'm
21        basically using the system by pretending like
22        I'm working for them, then I'm doing this on
23        the side."
24              All of this was found out.  And, at the
25        time, in December of 2012, we didn't
```

1　　　understand his role in this because we didn't

2　　　know as much about him, and we hadn't talked

3　　　to as many witnesses about him.  And the

4　　　discovery has been turned over.  And after

5　　　December 20th of 2012, is when he became a

6　　　target in this investigation.

7　　　　　　Now, granted, if I said, he would

8　　　receive a target letter, he would have if we

9　　　would have wanted to notify him.  We don't

10　　have to notify every target that they're going

11　　to be a target of an investigation.  He was

12　　notified that he was no longer going to be a

13　　confidential informant.

14　　　　　But regardless of that, in the grand

15　　jury he was never asked truly about his own

16　　distributions.  All he was asked about were

17　　other people's that were targets of the

18　　ongoing investigations.

19　　　　　THE COURT:  All right.  First, I find

20　　there are no conditions or combination of

21　　conditions to reasonably assure the safety of

22　　the community.

23　　　　　Now, considering the defendant's

24　　history, I mean, he has a long history of

25　　addiction and abuse.  And I don't know of

Case 3:13-cr-00003-NKM   Document 600   Filed 02/18/14   Page 78 of 91   Pageid#: 2403
(434)293-3600                    Produced by Cavalier Reporting                    (800) 972-4014
www.cavalier-reporting.com            Cavalier Reporting & Videography            info@cavalier-reporting.com

1    anyone that's a worse risk of committing a

2    crime than somebody, a drug abuser and someone

3    addicted.

4         I mean, it's just that he might not --

5    further distributes or not, but he's going to

6    be looking for it.  And I'm impressed by the

7    fact that there's no evidence that he has a

8    stable home to go to, where he doesn't rule

9    the roost.

10        I mean, his mother's testified that his

11   father used him to sell drugs.  And it seems

12   to me that she was around.  I don't know what

13   sort of influence she would exercise over him.

14   And apparently his wife, she knew what he was

15   doing, and she didn't exercise any control

16   over his activity when they were living at

17   home together.

18        I think he's a high risk of trying to

19   obtain drugs.  And I don't know what he'll do

20   to pay for them.  He may have to sell or trade

21   to pay for them, but anyway he hasn't rebutted

22   the presumption that he's at risk to the

23   safety.

24        And here, you take the fact he was on

25   State Probation at the time he was committing

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 79 of 91   Pageid#: 212

1      these crimes, alleged crimes, and I'll say

2      he's obviously presumed innocent at this

3      point.

4           But the strength of the evidence just

5      seems to be very strong.  And, I mean, we hear

6      that he's confessed.  And the other people

7      have said he had committed the crime.  And

8      that he's engaged not just in distribution,

9      but runs a high risk activity of shooting up a

10     16-year-old.  And rather blatant about his

11     violation and was conducting part of it while

12     he was supposedly working and deceiving the

13     police as an undercover agent.

14          But just the bottom line is, as I've

15     said before, I don't think there are any

16     conditions or combination of conditions to

17     assure the safety of the public.

18          Anything else?

19          MR. GRIMES:  Nothing, further Your

20     Honor.

21          MS. NEESE:  No, Your Honor.

22

23     (Hearing concluded at 10:48 a.m.)

24              * * * * *

25

 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 2              I, Darlene Joy Owings, Notary Public in

 3   and for the Commonwealth of Virginia at Large, and

 4   whose commission expires May 31, 2014, do certify

 5   that I was the court reporter at the

 6   aforementioned proceedings and that the foregoing

 7   is a true, correct, and full transcript of the

 8   proceedings herein.

 9              I further certify that I am neither

10   related to nor associated with any counsel or

11   party to this proceeding, nor otherwise interested

12   in the event thereof.

13              Given under my hand and notarial seal

14   at Charlottesville, Virginia, this 17th day of

15   February, 2014.

16

17

18

19

20          Darlene Joy Owings, Notary Public

21            Notary Registration No. 321187

22          Commonwealth of Virginia at Large

23

24

25

(434)293-3300
www.cavalier-reporting.com
Cavalier Reporting & Videography
info@cavalier-reporting.com
(800) 972-4993

WORD
INDEX

< $ >
**$1,800** 20:*10*
**$18,000** 23:*24*
67:2
**$25,000** 74:22
75:6
**$5,700** 52:20

< 1 >
**1** 3:*18* 5:*3*, 5
6:5 7:*13*
9:25 10:6
**10:48** 1:*14*
80:23
**100** 46:*14*
**12** 65:*12*
**15** 3:*4* 12:9
**150** 46:*14*
**16** 14:2 18:*1*
26:24 44:2, 5,
*10* 53:*3*, 7
72:*12*
**16-year-old**
26:23 33:2
58:*18* 59:6
61:*4*, 7 69:*13*
80:*10*
**17** 7:7 44:9
**17th** 81:*14*
**18** 4:*11* 19:*1*,
8
**18.2** 49:*12*
**18.2-178** 49:*13*
**19** 44:*10*
**1996** 43:2

< 2 >
**2** 3:*19* 7:*13*,
16 13:22, 24
**20** 6:*10* 10:2,
2 44:*3*, 10
70:*1*
**2006** 42:25
**2009** 10:*1*, 8
**2010** 21:24
**2011** 40:22
**2012** 5:9, 25
6:*10* 7:5 8:2
10:2, 3 15:24
16:*12*, 20
31:23 70:*1*
77:25 78:5
**2013** 1:*15*
4:*1* 5:*21* 7:8,
23 8:8, 22, 25
9:*12* 10:9, 24
11:*15* 12:3
21:24 26:*12*

34:6, *10*
35:*12* 41:*1*
49:9 50:*11*
56:5 58:*3*, 13
68:7 70:22
77:2
**2014** 81:*4*, 15
**20s** 32:8
**20th** 7:5
15:24 16:*11*
18:4 31:23
78:5
**21** 7:23 8:8,
*21*, 25 25:23
39:*1* 50:*11*
56:4 70:22
**21851** 1:*24*
**21st** 19:*10*
**22** 9:9 10:*11*
44:*3*, 11 45:8
51:5 58:*3*
73:*10*
**24008** 2:5
**24016** 2:*12*
**25** 1:*15* 4:*1*
12:*17*
**26** 11:*15* 49:9
**27** 3:7 45:*18*
56:*12* 57:8, *21*
**27th** 32:*17*
36:*17*
**28** 12:3
45:*19* 47:*10*
56:8, *10*, 14, 19,
25 57:4, 7, 17,
23, 25, 25
58:*13* 64:*15*
**28th** 21:*15*
23:7 41:*1*
**29** 64:*15*

< 3 >
**3** 3:*20* 6:*19*
7:*13* 9:4, 13
58:5
**30** 64:*14*
**31** 81:*4*
**310** 2:5
**3142** 15:5
20:25 21:6,
17 67:20
**320** 2:*11*
**321187** 81:*21*
**345-6572** 2:*12*

< 4 >
**4** 3:*3*, 21 6:*13*
**414** 42:8
**48** 3:7
**4th** 5:25

79:2
**abusing** 32:*23*
**abusive** 65:5
**act** 30:8
**Action** 4:9
**active** 32:7
**activities** 26:*1*
**activity** 77:*10*
79:*16* 80:9
**actual** 20:23
24:*17* 44:*13*
**add** 20:*11*
57:*3*, 7, 9
**added** 9:7, *10*
56:*14*, 19, 20,
21 57:8, *11*, 11,
23, 25
**addicted** 79:*3*
**addiction**
78:25
**additional**
18:22 19:7
21:*12* 67:8
**Additionally**
19:5 20:2
23:2, *11*, 23
24:3, 25
25:25 67:*19*,
24 68:*8*, 18, 23
69:5 77:*12*
**address** 71:6,
7
**addressed**
75:*14*
**admissibility**
71:5
**admissions**
46:22 67:24
68:5 76:22,
23 77:4
**admit** 38:23
39:4, 7, 11
63:*15*
**admitted** 24:4
32:*14*
**advised** 38:*10*

**aforementioned**
81:6
**AFT** 55:9
**age** 25:23
65:*12*
**agency** 54:25
**agent** 25:*19*
54:*21*, 23
55:6 80:*13*
**agents** 54:*18*
55:5, *11*, 17
**agree** 65:*21*
74:9
**ahead** 34:*21*

**aiding** 22:*13*
26:*10*, 11
**Alcohol** 54:*24*
**allegation**
10:23 11:5,
*10* 12:*19*
**allegations**
10:*18* 20:*3*
**alleged** 10:*10*,
15 19:*21*
58:*4* 80:*1*
**allegedly** 20:7,
8 73:*3*
**alleges** 9:*11*
**allowed** 53:*1*
**all's** 31:6
**altogether**
47:7
**Amanda**
33:25 34:2
39:*21* 40:5
61:*12* 77:*19*
**AMERICA**
1:5 4:*10*
**analysis** 43:25
44:*1*
**Andrews** 20:*1*
34:3, 4, 15, 17
35:*4* 39:8, 20
77:*19*
**Answer** 12:5,
15 66:5
**anybody** 17:6,
7, 7 50:20
**anymore** 9:21
**Anyway** 8:*19*
11:2 14:5
54:*13* 79:21
**apologize**
48:22
**apparent** 8:*13*,
17, 22 16:7
**apparently**
79:*14*
**appeal** 75:9
**APPEARANC**
**ES** 2:*1*
**appeared**
25:20 44:24
**apply** 30:6
**appointed**
13:*12* 70:6, 19
**appreciated**
36:*3*
**appropriate**
74:*17*
**approximately**
38:25 39:2
42:*10*
**April** 1:*15*
**argument** 15:8

**arranged**
75:*17*
**arrearages**
23:25 68:20
**arrest** 24:*3*
41:6 54:*18*
55:22 68:25
**arrested**
15:21 22:7
24:5 32:*18*,
20 36:21
37:25 55:*19*
**arrests** 36:*14*
**ASHLEY** 2:*4*
6:*15*
**ashley.neese@u**
**sdoj.gov** 2:6
**asked** 16:*4*, 5,
*10*, 22 17:*17*
34:*14* 51:2, 9,
*11*, 12 56:7
61:*24* 78:*15*,
16
**asking** 50:6, 8,
9 52:4 76:6
**assigned** 29:20
**Assistant** 6:*14*
**assisted** 54:*18*
55:21
**associated**
81:*10*
**assumption**
76:*3*
**assure** 21:*3*
78:*21* 80:*17*
**ATF** 17:7
43:5 54:*24*
55:*10*
**attention**
26:23
**Attorney** 6:*15*
8:*11* 56:7
58:2 66:6
69:25 70:7
**ATTORNEYS**
2:*4*
**Attorney's**
15:*16* 20:*14*
**authorities**
5:*12*, 16
51:*16* 55:23
62:*1*
**authority**
54:23
**Avenue** 2:*11*
**aware** 40:5

< B >
**Back** 8:7
13:*14* 16:*19*
21:*15* 23:6

< 5 >
**5** 3:*18*, 19, 20,
21, 22, 22, 23
7:25
**50** 39:9
**540** 2:6, 12

< 6 >
**6** 3:*23* 5:*3*, 5
11:*17* 12:3
48:24 49:6
56:*11*
**6:12-cr-00031**
6:2 7:9
**6:13-cr-00003**
9:2
**6:13-cr-00003-**
**NKM-18** 1:3
**60** 3:8
**6-13-cr-3** 4:9
**64** 3:*11*
**66** 3:*11*
**67** 3:*13*
**69** 3:*13*

< 7 >
**7** 11:22 12:*1*
**7:30** 42:*10*
**70** 15:25
**75** 3:*14*
**78** 3:*15*

< 8 >
**8** 9:*11* 10:9
58:3 68:7
**857-2250** 2:6
**8th** 19:*15*
21:24 26:*12*
34:6, *10*
35:*12* 77:2

< 9 >
**9:32** 1:*14* 4:*1*
**906** 2:5

< A >
**a.m** 1:*14*, 14
4:*1* 80:23
**abetting** 22:*13*
26:*11*
**able** 30:5
32:*15* 37:8
47:8 68:22
**Absolutely**
43:23
**abuse** 78:25
**abuser** 23:*11*,
12 24:2
72:*18* 75:4

(434) 293-3300
www.cavalier-reporting.com

6:13-cr-00003-NKM    Document 600    Filed 02/18/14    Page 82 of 91    Pageid#: 7249

*Reproduced by Cavalier Reporting*
*Cavalier Reporting & Videography*

(800) 972-4463
info@cavalier-reporting.com

38:8  47:23,
24  53:19, 21
58:1  61:23
**background**
4:21  5:8
14:20
**bad**  30:5  76:4
**baggies**  25:11,
21
**baggy**  46:11
**bags**  11:23, 24
12:7  14:11,
12  45:21, 23,
25  46:8  47:1
**Ballou**  9:16
12:1, 17  13:4
14:14  21:15
**Ballou's**  14:16
75:13
**bar**  65:13
**base**  76:2
**based**  24:19
25:11  40:18
44:21  46:1
67:15
**basically**
18:16  34:20
35:22  46:5
77:13, 21
**basis**  48:8
**BC**  46:6, 6
**Beach**  10:24
**Bedford**  5:12,
16, 23  11:11,
13, 16  16:22,
23  17:2, 3, 6
27:24  28:19,
22  29:1, 2, 9
30:12, 17
34:7, 24  42:9,
24  51:16
71:8  77:11
**bedroom**  25:1,
2  44:12, 18, 20,
24  45:11
47:12  57:2
**bedroom,**
44:19
**began**  5:16
9:25  11:7
**behalf**  2:6, 14
**believe**  12:19
13:4  30:3
33:23  48:18
65:12
**belonging**
52:22
**benefit**  31:17
**best**  46:5, 10,
13

**beyond**  71:16
**bills**  37:10
**biological**
60:12
**bit**  65:1
**Blacksburg**
40:13
**blatant**  80:10
**blue**  46:9
**Bohon**  32:5, 7,
14, 21  39:19,
21  40:9, 13, 16,
23  61:20
**bond**  74:13,
18, 21, 21, 22,
22, 25  75:7, 17
**book**  54:3
**bottle**  45:12
47:11  57:1
**bottom**  80:14
**bought**  17:18
37:11  39:9
46:21
**bragged**  37:6
**Brandon**
39:20
**break-in**  10:22
**brief**  50:25
51:2  71:22
72:7, 12
**Briefly**  60:6
67:11
**bring**  31:25
**brings**  14:21,
21
**broke**  10:25
**broken**  22:18,
19
**BROOKE**  2:4
**Bryant**  6:1
7:9, 18  39:5
**buildings**  48:2
**burden**  21:10
67:18  69:16
**BURNS**  1:8
4:10  5:9, 11,
22  6:10, 20
7:3, 21  8:8
9:7, 11, 12
10:3, 15, 19
11:6, 7, 13
12:12  13:13
15:6, 23  17:1,
4, 8  18:14
20:6, 6, 17
21:4, 23
25:22  28:2, 4,
18  29:19, 23
30:8, 17
31:14, 25
32:11, 13, 16,

21, 24  33:13
34:6, 12
35:25, 25
36:3, 21  38:8,
12, 17  39:25
40:2, 25  41:4
44:23  46:23
49:19  50:10,
14, 22, 23  51:9,
15, 25  52:11,
22, 22  55:19
56:1  57:20
59:25  61:11,
13  64:6, 11, 18
68:4  69:17
70:1  73:2
**buy**  22:12
35:22, 22
**buying**  74:1
**buys**  5:18
6:16  30:9

**< C >**
**cabinet**  54:3
**caliber**  51:6
**Call**  4:7  11:1
22:12  27:15
31:15  34:15,
18  35:24, 24
36:2, 7  42:19
63:19  68:6
**called**  6:11
7:22  11:23
31:24  35:24
**camera**  11:3
**cameras**  10:19
**car**  13:20, 22
28:25
**card**  31:1
59:20, 21  73:3
**cards**  52:21
**carry**  12:19
**case**  4:7  6:2
7:8  9:1
14:24  19:13,
13  21:5  22:2
30:25  37:13,
18, 23  46:18
48:19  62:12
69:22  72:15
76:12  77:1
**cases**  46:14
62:6, 7
**cast**  72:1
**caught**  16:19
**cause**  21:7
71:13, 18
**caused**  30:19
**cellophane**
45:9

**center**  14:4
44:8  53:9, 14,
22  54:1, 6
62:25
**center,**  53:14
**certain**  5:14
7:12  11:22
15:11, 13
18:12  19:23
21:19  54:19
77:6
**certified**  56:17
**certify**  81:4, 9
**changed**  18:12
**character**  23:4
**characteristics**
23:3  68:12
**charge**  5:22
36:12  73:9
76:9, 14
**charged**  17:9
19:25  21:18
22:1  28:25
29:12, 17
51:15, 21
52:1, 4, 11
58:23  60:24
61:15, 17, 21
67:16, 17, 22
**charges**  16:24,
25  55:16, 18
**charging**
20:15
**Charlottesville**
81:14
**chart**  15:9
**check**  52:20
**cherry**  33:11
**child**  23:25
65:16, 17
66:21, 24
67:2  68:20
**childhood**  65:2
**children**
12:14  24:25
45:7, 7  48:8
64:19  66:3
69:14
**children's**
47:16
**chooses**  23:16
**chosen**  16:18
**Chris**  5:11, 11
28:4, 10, 18
34:12  64:8,
12, 14  65:8, 17,
19  66:1
**CHRISTOPHE
R**  1:8  4:10
5:9  28:2  64:6

**Christopher's**
64:5
**CI**  18:21
35:24  36:2
**circumstance**
21:18
**circumstances**
67:21
**cited**  49:11
**City**  16:22
17:2  30:12
42:9  55:3
**clear**  75:22
**CLERK**  4:8
6:6
**client**  59:12
**climb**  14:5
**close**  24:24
47:15
**closely**  28:8
**Closing**  3:13,
13, 14
**clothes**  45:2
**clothing**  44:22
**Code**  49:11
**codefendants**
58:23
**collect**  31:12
**color**  46:10
**combination**
21:2  78:20
80:16
**come**  9:18
17:15  19:14,
18, 19  22:17
37:6  65:14
74:8
**comes**  20:12
27:8
**Coming**  10:17
33:18
**Commencing**
4:1
**comment**
33:10
**commission**
81:4
**committed**
80:7
**committing**
79:1, 25
**common**  72:23
**Commons**
2:11
**COMMONWE
ALTH**  81:1, 3,
22
**community**
21:3  26:5
69:11  78:22
**compare**  9:22

**complying**
49:24
**computer**
11:1, 2
**conceded**
14:10
**concern**  34:24
51:5  66:11,
16  67:1  75:15
**concerning**
31:6, 8, 9  35:3
**concerns**
49:10
**concluded**
80:23
**condition**  21:1
**conditions**
20:23  21:2
67:13  74:16
75:17  78:20,
21  80:16, 16
**conduct**  25:15
36:16
**conducted**
23:17  24:9,
15  36:5  42:3
71:19
**conducting**
80:11
**confessed**  80:6
**confession**
22:8, 9
**confidential**
16:18  18:9
28:19  30:9
31:16  35:5
78:13
**confused**  15:7
**consider**  26:6
**consideration**
68:16
**considered**
26:3
**considering**
78:23
**consistent**
25:24  40:19
46:2, 12
**conspiracy**
6:3  7:11, 12
9:25  10:7, 13
17:20  19:4,
21  21:9, 19
28:14  67:22
76:25  77:9
**contact**  28:2
**contained**
46:16
**container**
44:13

(434) 293-3301
www.cavalier-reporting.com

2013-cr-00003-NKM  Document 100  Filed 02/18/14  Page 83 of 91  Pageid#: 2459
Reported by Pamela Cox

*Cavalier Reporting & Videography*

(800) 972-4393
info@cavalier-reporting.com

continued
10:1 16:8
17:22 18:21
75:15
continues 7:5
continuing
10:8
contraband
53:2 54:14
contrary 69:20
contributing
60:2
control 31:20
35:21, 22
79:15
controlled
5:17 7:13
9:13 11:14
21:20 23:13
30:9 41:15
58:5
controls 77:16
convenience
7:15 9:3
conversations
5:15 11:8
73:4
convicted
37:16
Cook 5:23
8:16 11:6, 8,
12, 20 12:5
13:1 14:9
20:6 24:14
28:10 29:21,
22 32:13
34:11 35:16,
17 36:25
51:14 58:12
73:5 75:9
Cook's 38:6
cooperate
29:5, 15
cooperated
39:24
cooperating
6:11 18:9
copies 57:14
cops 23:10
26:20
Copy 3:18, 20
6:5 49:2
56:17 57:12
correct 12:15
35:9 37:24
38:13 49:16,
17, 20, 22
50:12, 13
51:22 52:22,
23 53:10
54:13, 25

55:1, 24 56:9
57:23 59:7, 8,
14, 22, 23 61:2,
5 62:8 66:22
81:7
correctly 16:5
COUNSEL
2:1, 6, 14 7:1
8:19, 20, 21
63:12 70:6,
19 81:10
Count 9:9, 10
10:10 58:3
73:9, 10
counts 36:13
67:18
County 5:12,
16, 23 11:12,
13, 16 16:23
17:3, 6 27:24
28:19 29:1, 3,
9 30:17 34:7,
24 42:24
County's 71:9
couple 29:25
41:5, 10
54:18 55:5
77:2
course 6:7
65:25 69:23,
23 71:7, 8
72:8, 13 74:5
COURT 1:1,
25 4:4, 7, 12,
14, 16, 19, 21,
22 5:1 6:5, 9,
19 9:3 11:20
14:8, 15 15:1
16:14 20:25
25:4, 7 26:6
27:12 40:21
42:5, 22
43:13, 24
44:3 47:14
48:12 49:20
51:20 56:1,
11 60:5 63:7,
15 65:3 67:6,
10 68:17
69:18, 25
70:6, 8, 10, 13,
19 71:4, 12, 18,
24 72:5, 13, 24
73:16, 21
74:3, 6, 18, 21,
23 75:2, 14, 20
76:1, 2, 18
78:19 81:5
court-appointe
d 7:1 8:20

courtroom
12:13 64:17
Court's 72:20
75:15
cover 29:24
crawl 53:19,
21
crime 49:15
79:2 80:7
crimes 80:1, 1
Criminal 4:8
49:25 50:1
52:3 72:11
75:2
criminally
28:25
Cross-Examina
tion 3:7, 11
14:9
crumbles
42:20
crumbly 42:19
current 19:21
curse 18:16
cut 18:20
46:7 73:6, 7

< D >
Dana 59:4, 5,
9 60:22
danger 15:6
26:4 69:10
73:15
Danielle 6:1
7:9, 18
Darlene 1:25
81:2, 20
date 10:7, 9,
14 12:2 77:8
dates 9:24
daughter
59:12
daughters
12:21
Davidson
54:21, 22
day 8:25
10:13, 24
12:20 18:6
32:11, 21
48:19 65:23
69:4 72:16
75:4 76:22
81:14
days 41:11
49:19 70:23
71:3
de 14:17, 18
DEA 17:7
55:9
deal 36:4, 5, 9

dealers 59:10
61:17
dealing 75:5
dealings 39:4,
7
deals 29:24
dealt 41:8
deaths 32:7
deceased 32:9
deceiving
80:12
December
6:10 7:5 8:2,
12, 21 10:2, 2
15:24 16:11
18:4 31:23
70:1 77:25
78:5
decide 57:7
76:2
decided 19:15,
17
decisions
20:15
deem 15:17
deemed 16:1
Defendant 1:9
2:14 4:11, 14
9:7 15:22
21:11 22:4
23:4 37:18
67:18 68:12
defendants
7:18 23:19
Defendant's
5:4 78:23
defense 63:12
69:23 74:11
defined 52:15
delivery 36:1
Department
5:24 28:22
34:8, 12, 25
42:24 55:4
DEPUTY 3:6
27:16, 18, 24
48:16
describe 46:11
described
14:11
detail 40:8, 11,
12
details 30:19
37:9
detained
27:11 67:15
76:8, 17
Detectives
17:6

detention 9:15
15:10 20:19
74:14 75:23
deteriorate
30:19
determine
21:8
determined
25:17
device 30:25
31:1 44:14
59:21
died 39:19, 21
difference
70:14
different
22:20 29:25
difficult 42:18
digital 31:1
52:19
Direct 3:7, 11
51:7
disagree 58:15
Discovery
50:1 78:4
disk 11:9
disks 11:1
dismiss 20:21
69:24 70:24
dispersions
72:1
dispositive
13:5 75:12
dissolving
30:16
distribute 6:3
7:12 17:21
21:19 65:12
67:23
distributed
9:12 10:15
16:9 24:5
41:16, 20
66:15 73:18
distributes
79:5
distributing
26:10 68:24
73:25 77:6,
14, 17
distribution
10:10 22:13
26:11 41:2, 5
51:3, 10 58:5
68:2 73:10
75:16 77:10
80:8
distributions
16:4, 6 78:16
distributor
16:9 23:13

26:7 32:2
39:12 61:2
68:18 69:11
distributors
17:24
DISTRICT
1:1, 2
divvy 65:11
docket 6:8
doctor 22:25
documents 5:2
doing 18:17
26:1, 18
31:14, 15, 17
43:9 74:20
77:22 79:15
door 47:20, 24
48:2, 2 65:13
driver's 13:18
42:11
drives 11:2
driveway
47:22
dropped 56:16
Dropping 12:9
drove 41:13
drug 9:17
10:20 21:8
22:21 23:11,
12 24:2
28:13 31:2,
18 38:23
43:9 51:3, 9
52:24 59:10,
22 61:1
65:24 66:11
67:15 69:3
73:5 75:4
79:2
drugs 5:14, 19
6:17 8:4
9:18, 19
22:17 58:7
61:17 65:6, 8,
15, 20 66:15
68:15, 22
72:19, 25
73:18 74:1, 1
75:5, 5, 16
77:6, 14, 16
79:11, 19
Dryden 28:22
29:8 54:17
55:3
due 69:23
71:6, 7 72:8,
13
duly 27:19
63:22

(434)293-3000
www.cavalier-reporting.com

Reported by Tailored Court Reporting
Cavalier Reporting & Videography

(800) 972-4865
info@cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 84 of 91   Pageid#: 272

< E >
earlier 50:19
easy 42:21
effect 22:20,
21
eight 7:10, 19
22:9
either 17:9
22:19 29:12
39:24 74:7
electronic
74:23
Elm 2:11
employed
27:23 42:23
employment
23:14, 15
28:1, 7, 17
empty 11:23
12:7 14:11
45:20, 23, 24
47:4
encompasses
77:9
encourage
16:15
encouraged
29:14
engaged 80:8
entertainment
44:7 53:9, 13,
14, 21 54:1, 6
62:25
entitled 63:2
equipment
30:21
ESQUIRE 2:4,
10, 10
essence 73:9
essentially
23:16, 19
event 81:12
events 58:2
evidence 5:6
12:23 13:9
14:13, 22
18:3 20:10
21:12, 14
22:4, 6 27:13,
14 49:15
50:3 55:12
63:9, 17
65:19 67:8,
20 68:3
69:15 70:10
71:10 73:14,
15, 17, 21, 22
77:12 79:7
80:4

exactly 28:23
35:20 40:14,
16 74:20 76:5
Examination
3:7, 8, 11 51:8
excuse 26:10
executed 38:3
42:9 69:2
executing
50:15
execution 13:2
exercise 79:13,
15
Exhibit 3:21
5:4 6:5, 13
7:16, 25 9:4
11:17 48:24
49:6 56:11
Exhibits 5:3
experience
25:19 28:18
33:8 43:12
46:1
expires 81:4
explain 47:13
expose 65:8
extract 30:6
47:8
extremely 65:5

< F >
face 72:5
fact 12:16, 20
13:4, 6 37:7
46:19 72:23
74:19 76:11,
20 79:7, 24
factor 26:3, 5
75:12
factors 15:5,
11 21:16
27:9 60:2
67:21 76:8, 17
facts 72:22
fairly 31:13
32:8
fallen 62:24
falls 31:4
false 37:20
49:10, 16
50:3 51:16,
22, 24 52:1, 12
55:13 62:11
71:11
familiar 30:21
family 27:6
far 40:12, 14
48:3, 6
father 60:10,
12, 18 65:3, 4,

6, 8 66:1, 2
79:11
favor 27:10
February 4:1
7:23 8:8
19:10, 15
34:6, 10 81:15
federal 17:10
21:25 26:13
29:12 37:18
49:20, 24, 25
50:1, 11
54:25 55:11,
16, 17, 18, 23
56:1 61:24
62:1, 3, 5, 15
71:17 72:24
76:9
feel 20:18
74:24
felon 37:16
female 45:1
fence 33:16
field 25:15
42:15 43:14,
15, 22 46:25
47:3
Fielder, 41:22
file 37:19
69:23 70:24
71:23
filed 9:1, 3
37:8, 20 56:4
58:24
Filled 57:1, 15,
18
finally 26:21
financial
52:21 62:20
find 17:22
74:3 78:19
firearm 20:9
62:17
Firearms
54:24
fireproof
52:19
First 2:5 7:4
8:1 9:8, 23,
24 10:4
13:17 15:7, 8
21:5 33:11
42:10 49:6
68:13 72:20,
21 78:19
five 49:19
64:25 70:23
71:3
flies 43:2
flight 75:1
flipping 14:1

floor 53:24
54:2
following
36:16
follows 27:19
63:22
force 30:6
43:5
foregoing 81:6
form 57:3
Formed 57:6
forth 15:12
21:13, 14
67:20
forward 7:7,
21 8:24
10:17 33:18
37:6
found 5:14
11:24 12:10,
22 13:3, 4, 8,
16, 20, 24 14:3,
6 25:1, 2, 3
28:23 32:9
42:6, 10 44:4,
12, 14, 17, 21
47:12 53:8
69:4 75:10
76:15, 18, 19,
24 77:24
four 21:21
45:10 57:12
77:9
Franklin 2:11
42:9
frankly 12:19
fraud 37:5, 12
52:8 62:10
frequently
62:2
front 33:24
45:21 47:20,
24, 25 48:1
full 55:7 81:7
full-time
23:22 48:8
fun 43:3
further 46:18
48:10 60:3
63:5 67:4
79:5 80:19
81:9

< G >
garage 13:19,
21, 25 24:12
42:13 44:6
48:1 53:15
75:11
general 23:4

gentleman
72:16
George 59:3,
9 60:19
getting 49:24
Giles 39:22
41:8, 13, 20, 24
GINA 3:10
63:19, 21 64:4
girl 41:9
give 37:9
39:19 40:21
46:13 47:20
65:14 71:25
74:7
given 14:19
81:13
gives 43:17
giving 4:21
go 19:9
20:24 21:16,
17 23:20
31:10 39:16
42:7 45:18
47:24 58:1
62:14 65:13
68:19, 23
69:9 71:4
79:8
goes 23:16, 21
27:2 55:8
56:11 64:8
72:14
going 15:2
17:8 18:15
19:6, 7, 8
21:4, 13, 17
23:2, 5, 7
24:8 25:13,
18 26:13, 14
29:19 35:12,
23 37:3 44:2
45:22 61:23
67:13 68:11
76:8 77:14,
20 78:10, 12
79:5
Good 4:4, 5, 6
48:16, 17
66:1, 2, 10
Goodman
39:22
gotten 61:5
Government
4:12 5:18
6:18 7:6
10:21 14:23
18:24 21:25
22:5 26:14
27:10 48:25
49:24 51:12

61:25 62:1, 5
72:9 74:1, 2
75:6 77:15, 16
Government's
69:22 72:15
Grand 3:19,
22 6:12, 12
7:4, 23 8:1, 2,
5, 9, 13, 21
10:3 16:1, 11
17:11, 15
18:7, 22 19:9,
19, 19 22:11
27:5 31:24
33:4, 20
41:25 49:20
50:12 78:14
grandchildren
66:19
grandparents
60:19
granted 24:14
78:7
Gretchen 41:9,
21, 22, 23, 24
GRIMES
2:10, 10 3:3,
7, 11, 13 4:5,
15, 18, 20, 25
5:7 14:18
15:7 18:11
24:17 48:15
60:3 63:14,
16, 18 64:2
66:4 67:8
69:19 70:12,
16 71:6, 15, 22
72:4, 7 73:19,
22 74:5, 9
80:19
groundwork
40:14
guess 4:16
30:16 32:14
46:13 47:20
56:16
guilty 74:4
gun 37:20
71:13 76:18,
19
guys 28:8

< H >
half 46:7
hand 81:13
handed 6:5
handler 5:22
11:13
happened
12:4 21:10

(435)298-3001
Cavalier Reporting
www.cavalier-reporting.com

2:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 85 of 91   Pageid#: 2193

Reported by: Arlene Cupp
Cavalier Reporting & Videography

(800) 272-9393
info@cavalier-reporting.com

35:20  40:14,
16  54:9
**happening**
26:25
**hard**  11:1
**head**  39:3
**hear**  24:8
25:13, 19  80:5
**heard**  67:10
77:12
**Hearing**  1:12
4:24  5:3  6:4,
14  7:17  9:4,
15, 19  11:21
12:1  13:12
15:10  20:22
24:16  67:9
71:17  73:23
74:8, 10, 13, 14
75:24  80:23
**Heather**  41:18
**he'll**  79:19
**help**  9:18
22:16  29:6
65:24
**heroin**  11:23
12:7  14:10,
11  25:21, 22
37:11  45:21,
23, 24  46:3, 12,
14, 16, 21, 23,
25
**hesitation**  61:8
**hey**  26:24
40:15  77:19
**high**  22:23
79:18  80:9
**historical**  4:21
5:8  14:20
**history**  23:3
52:3  68:11
74:25  75:2
78:24, 24
**home**  10:19
12:21  27:7
74:23  79:8, 17
**honestly**  18:23
**Honor**  4:5, 6,
13, 15, 18, 20,
25  5:8  6:4
9:14  10:2
11:19  14:1,
18, 25  15:2
18:23  20:2
22:18  25:9,
25  48:11
49:7  60:4, 6
63:6, 10, 14, 18
67:5, 11
69:20  71:1,
16, 23  72:10

**individual**
35:25
**individuals**
16:10  22:1
24:6, 7  36:20
38:4  39:23
41:25  45:3
**influence**
79:13
**inform**  42:5
44:3
**informant**
5:17  6:17
7:6  11:14
16:18  18:10
28:19  30:9
31:16  35:5
37:5  73:25
78:13
**informants**
30:4  31:11
**information**
19:17  24:20
31:10, 12
51:13  52:8
54:7  68:19
**informer**
46:19
**inject**  32:15
59:12
**injected**  22:20
32:16  33:7
40:4, 16  61:8,
13  69:12
**injecting**
17:25  26:22
32:23  33:11
40:3
**innocent**  80:2
**inside**  28:25
29:2  31:2
44:18  47:6
**instance**  21:21
**insufficient**
73:14
**insurance**
37:5, 12
46:20  52:8
62:10
**intend**  76:13
**intent**  57:3, 6
**interest**  30:4
**interested**
37:15  81:11
**Interestingly**
41:12
**interrogate**
50:20
**interrogated**
50:14, 17, 18

**interview**
32:13, 17
34:11  38:18,
21  40:10
**interviewed**
19:15  33:2
34:7  38:9
41:1  50:21,
22, 23  51:14
**interviewing**
50:24  52:9
**interviews**
17:12
**inventory**
13:11, 14, 17,
23  53:4, 4, 7
56:8, 15, 20
57:13, 16, 20
**investigation**
6:22, 23, 24
8:15  15:14,
25  16:8
31:23  33:14
52:7  62:3, 4
70:2, 3, 4
78:6, 11
**investigations**
43:10  78:18
**investigative**
51:18
**Investigator**
5:23  8:16
11:8, 12, 20
12:5  13:1
14:9  20:6
24:12, 14
28:10  29:21,
22  32:13
34:11, 11
35:16, 17
36:25  38:6
51:14  58:12
75:9
**invited**  55:11,
14
**involved**  5:18
10:21  58:7,
14  61:25
65:6  68:6, 8
**involvement**
6:16  68:2
**involving**
31:18  55:22
**issuance**  71:9
**issue**  15:18,
19  20:19
50:2  72:9
76:11
**issued**  11:11,
16
**issues**  76:11

**item**  13:17, 22,
24  14:2
42:10  53:3, 7
56:8, 10, 14, 19,
25  57:4, 7, 17,
23, 24, 25
**items**  24:17
25:3  52:24
57:21
**its**  14:23

**< J >**
**January**  7:7
**Jenny**  20:1
39:22
**Jesse**  39:18, 21
**Job**  1:24
23:23
**JOE**  3:6
27:16, 18
**joint**  55:22
**Jonathan**  32:5
61:20  64:11
**Joy**  1:25
81:2, 20
**Judge**  3:15
9:16  12:1, 16
13:4  14:14,
16  21:14
66:6  75:12
**Jury**  3:19, 22
6:12, 12  7:4,
23  8:1, 2, 6, 9,
13, 21  10:4
16:1, 11
17:11, 15
18:7, 22  19:9,
19, 20  22:11
27:5  31:24
33:4, 20
41:25  49:20
50:12  78:15

**< K >**
**keeping**  24:1
30:4
**Kevin**  39:18
**key**  40:9
**Kevin**  26:25
**kind**  37:3
46:12
**Kirsey**  20:1
39:22, 22
**knew**  21:25
26:14  40:16
50:10  79:14
**know**  25:8
28:4, 17, 24
30:18, 20, 24
31:14  35:16
38:15  42:19

**45:14  52:5, 7
54:4, 4, 6
55:7, 15
56:17  58:9,
10  59:13, 16,
17  64:16
70:17  71:15
72:2, 17  78:2,
25  79:12, 19
**knowingly**
18:1
**knowledge**
29:18
**known**  23:18
26:15
**knows**  41:9
**Kristin**  64:4

**< L >**
**lab**  25:10, 16
43:17, 20, 21,
25  44:1
45:16  47:2, 8
**ladder**  14:5
**laid**  15:9
40:13
**large**  16:9
81:1, 3, 22
**lasted**  21:20,
22
**law**  53:2
71:17
**lawfully**  22:25
**Laying**  54:2
**lays**  67:18
**lead**  32:20
**leave**  53:1
54:14  57:19
**left**  25:14
37:20  57:14
**length**  48:1
**lengthy**  38:21
**Lentz**  59:3, 9
60:10
**LES**  1:8  4:10
5:9  28:2
52:22
**letter**  8:10
15:18, 19  78:8
**level**  17:9, 10
29:12, 13  76:9
**liabilities**
68:19, 21
**lie**  70:13
**lied**  23:8, 9, 10
**life-long**  72:17
75:4
**light**  46:9
**Line**  12:3, 9
27:9  80:14

(434) 293-3300
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 86 of 91   Pageid#: 272499

Produced by Cavalier Reporting
Cavalier Reporting & Videography

(800) 972-4904
info@cavalier-reporting.com

list 19:*1*
39:*14* 57:*16,*
*25*
listed 7:*14*
41:*7*
lists 57:*13*
little 39:*19*
74:*12*
live 12:*11, 20*
60:*15* 66:*24*
lived 60:*21*
lives 27:*1*
living 79:*16*
locate 62:*17*
located 66:*19*
long 13:*15*
38:*25* 42:*23*
43:*4, 10, 11*
64:*23* 68:*15*
78:*24*
longer 21:*22*
78:*12*
look 9:*5* 10:*5*
13:*10* 18:*25*
23:*2* 40:*10*
49:*15* 50:*2*
56:*11* 63:*2*
71:*10* 73:*8*
looked 44:*22*
looking 35:*9,*
*11* 37:*17*
52:*18* 62:*20*
79:*6*
looks 6:*19*
57:*16*
loose 73:*6, 7*
Lord's 31:*15,*
*16*
lot 30:*3*
38:*19* 40:*11*
51:*3* 62:*7*
love 66:*13*
loves 66:*2*
Lucky 55:*8*
Lynchburg
1:*16*

< M >
ma'am 28:*3, 6,*
*9, 11, 15* 29:*7,*
*18* 30:*11, 14*
32:*1* 33:*3, 17*
34:*4, 13* 35:*3,*
*14, 19* 38:*14*
39:*13* 43:*11*
46:*24* 60:*14,*
*21* 61:*3, 6, 14,*
*16, 19, 22* 62:*9,*
*21, 23* 63:*1, 4*
magically
30:*24*

magistrate
76:*10*
Magistrate's
4:*23*
main 30:*2*
making 14:*14*
33:*10* 76:*3*
male 45:*1*
man 32:*4*
mansion 48:*5*
March 5:*21*
8:*25* 9:*11*
10:*9* 11:*15*
12:*3* 21:*15,*
*24* 23:*7*
26:*12* 35:*12*
41:*1* 49:*9*
50:*11* 56:*4*
58:*3, 13* 68:*7*
70:*22* 73:*13*
77:*2*
Marijuana
25:*2* 44:*13*
47:*12* 57:*1*
marked 5:*2, 5*
married 60:*13*
64:*16, 24*
master 44:*24*
materials
11:*18*
Matt 39:*22*
41:*8, 13, 20, 24*
matter 6:*7*
8:*5* 19:*4*
Mazda 13:*19*
42:*12*
McKinney
33:*25* 34:*2*
39:*21* 40:*6*
61:*12* 77:*19*
mean 18:*5*
19:*2, 5* 20:*18*
26:*2* 31:*3*
35:*6, 8* 37:*17*
42:*23* 47:*17,*
*19* 50:*6*
53:*12, 25*
54:*5* 59:*16*
62:*14* 70:*14*
71:*19* 72:*22*
74:*6, 12*
78:*24* 79:*4,*
*10* 80:*5*
meant 50:*25*
media 52:*19*
medication
16:*20*
melted 45:*10*
memory 11:*2*
48:*21*
mentally 65:*4*

metal 44:*14,*
*16*
methamphetam
ine 6:*3* 19:*13,*
*23*
Miata 13:*19,*
*24* 42:*12*
Michelle 59:*4*
mind 75:*13*
minor 18:*1*
24:*25* 26:*25*
33:*2, 5* 58:*18*
69:*13*
minors 45:*6*
minute 51:*7*
Miranda 22:*7*
36:*24*
mislead 35:*2*
missing 11:*9*
20:*7, 9, 10*
73:*3, 6*
money 37:*10*
46:*20* 49:*10,*
*16* 50:*3*
51:*16, 21, 24*
52:*1, 12*
55:*13* 62:*11*
71:*11*
monitoring
74:*23*
month 8:*24*
71:*2, 2*
months 5:*19*
Moon 1:*13*
66:*6*
morning 4:*4,*
*5, 6* 40:*20*
41:*12* 48:*16,*
*17* 66:*10*
mother 60:*22*
61:*5* 64:*6*
68:*14*
mother's
79:*10*
motion 4:*17*
20:*21* 69:*24*
70:*24* 71:*23*
mouth 22:*16,*
*24*
Moving 7:*7,*
*21* 8:*24*
multiple 14:*2*
31:*11, 12, 24*
44:*6* 53:*8*
multi-year
65:*20*
Myrtle 10:*24*

< N >
name 27:*22*
31:*25* 41:*23*

55:*7* 58:*19,*
*19* 59:*2* 64:*3,*
*17*
named 7:*20*
32:*5* 41:*9*
names 33:*23*
54:*20*
narcotics 7:*13*
32:*23*
nature 21:*17*
26:*4* 67:*21*
69:*9*
necessary
30:*6* 74:*24*
need 15:*11*
20:*24* 56:*5*
57:*9* 62:*14*
needle 13:*18,*
*20* 42:*11*
needles 11:*22*
12:*7, 22, 24*
13:*3, 8, 16*
14:*2, 6* 44:*6*
53:*8, 18* 75:*10*
NEESE 2:*4*
3:*4, 7, 8, 11, 13,*
*14* 4:*6, 13*
6:*15, 20* 9:*20*
15:*2* 16:*17*
25:*6, 8* 27:*14,*
*21* 48:*10*
60:*6, 9* 63:*5,*
*10* 66:*9* 67:*4,*
*11* 71:*1*
75:*19, 21*
76:*5, 19* 80:*21*
NEILL 2:*10*
neither 81:*9*
network 41:*2*
68:*2* 77:*11*
never 8:*9*
13:*7, 7* 16:*10*
51:*21, 25*
78:*15*
night 40:*20, 20*
nods 39:*3*
normally
29:*24*
Norman 1:*13*
notarial 81:*13*
Notary 81:*2,*
*20, 21*
note 68:*13*
74:*19*
noted 45:*20*
51:*6* 69:*7*
notes 50:*19*
54:*5*
notified 15:*20*
17:*8, 10, 11, 13,*
*16* 18:*6*

19:*11* 26:*12*
29:*1* 78:*12*
notify 6:*23*
16:*12* 70:*3*
78:*9, 10*
novo 14:*17, 19*
Number 4:*9,*
*11* 6:*2* 7:*8*
8:*4* 11:*1*
19:*1, 8* 44:*2,*
*2, 3, 5, 10* 45:*8,*
*18, 18* 47:*10*
51:*6*
Numbers 5:*4*
49:*12*
numerous
16:*10* 17:*23*
20:*16* 22:*1*
23:*9, 10*
26:*15* 27:*4*
67:*24* 69:*3,*
*12* 77:*4*

< O >
oath 58:*13*
object 71:*1*
obtain 79:*19*
obtaining
49:*10, 16*
50:*3* 51:*16,*
*21, 24* 52:*1, 12*
55:*13* 62:*11*
71:*10*
obvious 31:*13*
obviously
35:*1* 37:*16,*
*18* 70:*21* 80:*2*
occurred
65:*16*
occurring
73:*24*
October 5:*8,*
*25* 16:*19*
offense 9:*24*
10:*9* 21:*18*
67:*16, 22*
69:*6, 8* 77:*8*
offer 7:*16*
OFFICE 2:*4*
15:*16* 20:*14*
27:*25* 28:*20*
29:*10* 30:*17*
31:*7* 38:*9*
officer 5:*22*
17:*2* 28:*21*
29:*8* 30:*2*
43:*5* 54:*17*
55:*3* 63:*13*
69:*25* 70:*8*
73:*4*

officers 35:*19*
officer's 31:*19*
official 57:*24*
Oh 54:*10*
Okay 4:*22*
39:*16* 42:*4*
45:*20* 49:*4*
50:*22* 56:*13*
57:*12, 14, 14*
60:*5* 61:*23*
65:*15, 16*
67:*10* 72:*6*
old 64:*12, 13*
once 15:*20*
16:*7* 19:*18*
21:*9* 46:*11*
62:*18*
ongoing 15:*25*
77:*10* 78:*18*
Opening 3:*3,*
*4* 14:*19, 24*
15:*3, 4*
opinion 75:*13*
opportunity
43:*18*
order 74:*18*
ostensively
71:*10*
outbuilding
13:*16, 19*
14:*3* 27:*2*
44:*7* 47:*17*
53:*8*
outbuildings
24:*10, 23* 69:*2*
Outside 31:*19*
overcome
69:*16*
overdose 32:*7*
overdosed
32:*9*
Overstreet
41:*19*
overwhelming
69:*15*
Owings 1:*25*
81:*2, 20*

< P >
packaged
46:*3* 47:*7*
packaging
43:*17*
packet 11:*17*
Page 6:*19*
9:*8* 11:*22*
12:*1, 17* 14:*1*
49:*6*
pages 13:*14*
paper 62:*22*
63:*3*

(434) 293-3300
4:*13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 87 of 91   Pageid#: 12493*
Cavalier Reporting & Videography
(800) 972-4993
www.cavalier-reporting.com
info@cavalier-reporting.com

paperwork
  5:10  57:13
Paragraph
  9:25  10:6
paraphernalia
  52:25  69:3
parents  58:22
  59:6  61:15,
  17, 21
parked  42:12
  47:21
Parker  59:4, 5,
  9  60:22
part  6:8  14:4
  19:23  21:8
  28:13  35:13,
  15  69:8  80:11
participate
  55:12
particular
  58:8
particularly
  43:16
party  81:11
passed  40:23
pattern  72:23
pay  79:20, 21
payable  52:20
paying  24:1
  26:23  68:21
PC  2:10
pending  55:25
  56:2  72:9
  74:25
people  7:8
  9:17  17:25
  19:7, 24
  22:15  29:9,
  25  32:22
  33:15, 18
  35:2  39:14,
  15, 17  40:10,
  19  41:7  54:8
  58:22  65:14
  69:12  70:14
  73:17, 19
  74:19  80:6
people's  78:17
perceptive
  47:20
period  5:19
  51:1, 2  54:19
  77:6
periods  59:15
permit  74:24
  75:17
permitted
  74:21
person  26:5
  31:11  35:23

40:5  69:10
personal  52:19
persons  7:19
perspective
  39:19  40:22
  46:13
ph  20:1
  28:22  59:3
  64:4
phone  22:12
  34:15, 18
  35:24  36:1, 7
  68:6
physically
  65:4
picked  55:16,
  18
picks  23:16
pickup  45:21
  47:21, 23, 25
piece  62:22
  63:3
pieces  31:12
  57:13
pill  22:14, 22
  44:13  47:11
pills  17:18, 21,
  25  26:8, 23
  27:3  32:2
  39:12  40:3
  45:10, 14
  58:13  61:5, 8,
  13  69:11, 13
  73:11  77:3
pipe  25:2
pistol  51:6
  52:18
place  77:17
places  66:18
plain  54:10
Plaintiff  1:6
  2:6
plastic  11:24
  14:12  25:21
playing  18:17
  26:18  33:15
  77:13
please  4:7
  27:22  28:16
  43:13  45:18
pleasure  33:9
point  8:18
  11:6  12:24
  16:3, 13, 17
  17:5, 13, 19
  18:8, 20, 23
  19:5, 10, 12
  25:9  27:15
  29:4  30:15
  34:5, 14
  36:11  59:19

69:21  75:8
  76:13, 23  80:3
pointing  77:1
points  18:12
Police  28:22
  37:8  55:4
  80:13
popped  33:10
position  28:1,
  7, 17
possible  37:17
post-Miranda
  67:23  68:5
potential
  16:25
potentially
  29:6  74:8
powder  46:6, 7
prefer  43:17
prescribe
  22:25
prescribed
  22:15, 15
prescription
  5:14  8:4
  16:20  32:23
  45:12  65:20
  72:19, 25
prescriptions
  5:19  16:21
present  15:4
presentation
  14:22
presented
  20:15
presumed  80:2
presumption
  21:5  27:9
  67:14  79:22
pretending
  77:21
pretense  51:24
pretenses
  49:10, 16
  50:4  51:17,
  22  52:2, 13
  55:13  62:11
  71:11
pretrial  23:24
  63:11  69:7
pretty  30:21
principally
  28:23
prior  41:6
privy  18:4
  24:16
probable  21:7
  71:12, 18
probably  8:17
  21:22  46:14
  47:19

probation
  26:2  63:13
  69:6  79:25
problem  8:3
  13:6  33:12
  65:20, 24
Procedure
  49:25  72:11
proceed  4:19
  72:10
proceeding
  6:9  81:11
proceedings
  8:18  81:6, 8
proffer  74:12
  76:22
proper  42:20
property
  24:11, 24
  47:18
provide  22:9
  33:4  40:11
provided
  19:16, 17
  22:8  36:24
  39:13  40:11
  51:13  67:25
proximity
  47:15
public  6:8
  80:17  81:2, 20
pulled  5:11
purchase
  68:22
purchasing
  77:15
purpose  9:4
  73:20  74:10
pursuant  13:2
put  14:23
  15:25  17:20
  18:21  20:13
  21:13, 14
  27:13, 14
  45:24  46:6
  63:12

< Q >
qualified  6:25
  70:5, 18
quantity  47:6
  58:7
Question  12:4
  50:7, 8, 9
  72:25
questioned
  6:14  23:6, 6
  33:15
questioning
  11:25  58:1

questions
  48:10  51:3
  61:23  63:5
  66:5  67:4
  quite  20:11
  62:2
quote  18:15
quoting  6:21
  12:18

< R >
random  40:15
rank  18:24
read  8:13
  9:14  11:20
  14:4  16:2
  32:12  49:12
  75:13
Readily  8:22
reading  50:19
ready  4:12, 14
real  42:20
really  11:24
  42:18  50:5
  68:15
reason  12:23
  30:2  37:15
  43:15  58:14
  76:7
reasonably
  21:3  78:21
reasons  8:16
  75:9
rebut  15:3
rebutted  79:21
receive  6:25
  8:11  70:5, 19
  78:8
received  5:5
  8:10
record  6:8
  7:15, 24  8:5
  12:2  27:22
  49:6  54:9
  58:3  70:9
  75:23
recorded
  22:12, 12
  34:15, 18
  35:24  36:1, 7,
  9  68:6
recording
  10:20  11:3, 7
  30:25  31:1
  59:20, 21
recordings
  20:4, 5  26:9
  30:24  73:4
records  52:21
  62:20
recover  54:8

recovered
  13:18  57:2
Redirect  3:8
reference  37:4
  52:8
referred  5:10
referring  10:6
  11:21  51:13
regarding
  15:12  19:22,
  24  20:1, 23
  21:4, 23
  30:12  33:13
  34:18  36:15
  41:5  42:2
  61:24  62:18
  68:1  75:21
  76:14
regardless
  25:18  78:14
Registration
  81:21
rehash  67:12
related  6:9
  37:12  62:12
  76:12  81:10
relationship
  30:16  65:2
release  69:16
  74:16
released  75:18
rely  43:21
remain  27:11
  74:25
Remember
  11:12  16:4
Remodeling
  52:20
remove  31:5
removed  31:2
  59:21
report  23:24
  37:8, 20
  63:11  69:7
REPORTED
  1:25  71:13
Reporter  1:25
  81:5
represent
  13:13
representation
  70:8
requesting
  27:10
residence
  11:25  12:7, 8,
  11  47:14
residing  60:20
residue  13:23
  25:1, 4, 14

(435)238-3091
www.cavalier-reporting.com

Reported by Arlene Clyde
Cavalier Reporting & Videography

(800) 272-3993
info@cavalier-reporting.com

4:13-cr-00003-NKM   Document 60   Filed 02/18/14   Page 88 of 91   Pageid#: 255

42:13  44:15,
17
**respect**  7:16
11:14  69:21
**result**  32:16
43:21  52:11
**retained**  8:20
**Return**  3:23
11:17  56:18
57:5, 12, 15, 24
**returned**  5:21
**review**  14:16
**reviewed**  4:23
**REYNOLDS**
3:6  6:1  7:10,
18  27:16, 18,
24  39:5  48:16
**right**  4:16
5:7  8:7
10:17  15:1
24:3  27:12
32:3, 6  34:23
38:11  41:22
44:5, 12  45:1
48:12  49:2,
14, 18, 23
50:20  53:6,
16  54:15
57:16  58:17
63:7, 9  64:10,
12, 23  66:1, 4
67:6  69:18
70:16  72:17
78:19
**rights**  22:7
36:23, 24
37:1  38:10, 12
**risk**  75:1
79:1, 18, 22
80:9
**Roanoke**  2:5,
12
**rodeo**  72:21
**role**  19:4, 11
38:1, 7  78:1
**Room**  2:5
47:16
**roost**  79:9
**round**  45:10
**routine**  5:13
**Rule**  72:12
79:8
**Rules**  49:25
50:1  72:11
**Ruling**  3:15
12:17  14:14,
16, 19
**runs**  80:9
**Russell**  54:21

< S >

**safe**  30:4
48:7  52:19
**safety**  21:3
30:2  78:21
79:23  80:17
**sales**  5:18
**Samantha**
58:19
**Samantha's**
60:10
**saying**  46:19
51:23, 25
70:20
**says**  9:17
10:7  12:18
13:17  14:2
31:11  41:22
53:7  54:4
**Schedule**  7:13
9:13
**Scheduled**
58:5
**scope**  52:15
71:16
**Scott**  34:4
**Scotty**  20:1
34:3, 15, 17, 22
35:4  39:8, 20
77:19
**SD**  31:1
59:20  73:3
**seal**  81:13
**Search**  3:23
11:11, 15, 16
12:6  13:2, 10
24:9, 15  37:4,
15, 22  38:2, 3
41:13  42:2, 8
48:23  49:5, 8,
9, 14, 19  50:2,
15  51:19, 23
52:10, 12, 15
54:16  55:12,
21  56:23
57:4, 4  61:25
62:15, 18
69:1  71:9, 13,
19, 20, 20  72:1,
9  75:21, 24
76:3
**searched**  56:3
**seat**  13:18
42:12  45:21
**second**  7:11,
22  8:9  9:23
71:7
**section**  15:8
49:12
**secured**  38:2
74:22  75:6
**Security**  52:21

**see**  5:10  7:17
9:6, 9, 16, 23
23:23  37:19
46:11  52:24
53:3  54:15
56:18  65:24
71:25
**seeds**  47:12
57:1
**seen**  46:14
72:22
**seized**  12:8
24:18, 19, 21,
22  54:13
**self-admitted**
23:12, 12
24:2  25:22
26:7  27:2
61:1  66:11
**sell**  79:11, 20
**sells**  6:16
**send**  42:16
**sent**  25:10, 16
35:25  45:16
47:2, 6
**separate**  13:21
**September**
16:20
**serial**  51:6
**seriousness**
26:4  69:10
**served**  56:23
**serves**  48:21
**services**  23:24
63:11  69:7
**set**  15:11
35:21  47:14
60:19  67:20
**setting**  36:4
**settlement**
46:21
**shelf**  14:6
54:3
**Sheriff's**  5:24
27:25  28:20
29:10  34:7,
12, 25  38:9
42:24
**shifts**  21:10
**shooting**  80:9
**short**  13:15
**shortly**  5:20
**shot**  32:11
**show**  49:2
56:5  75:1
**shows**  15:5
57:24
**side**  26:19
77:18, 23

**sides**  18:17
26:18  33:16
77:13
**simply**  7:15
**single**  46:15
**sir**  4:8, 15
15:1  48:16,
17, 22  49:12,
18, 21  50:19
51:22  52:6
54:12, 14
56:4, 10
58:16  59:11
60:2  63:7
**sit**  18:24
**situation**  23:1
30:5
**six**  5:1  64:25
**small**  45:7
46:10
**SMITH**  3:10
63:19, 21
64:3, 4  66:10
**smoking**  25:2
44:14
**snorted**  22:19
**Social**  52:21
**society**  15:6
73:15
**sold**  39:14
41:10
**somebody**
10:16  19:18
35:8  50:21
79:2
**someone's**
72:24
**son**  64:10, 13,
14, 16  66:11,
14
**son's**  65:2
**sorry**  34:9
38:16  44:10
64:22
**sort**  11:2
79:13
**source**  54:7
**south**  8:15
59:24  73:2
**Southwest**  2:5,
11
**speak**  75:2
**speaking**  12:6
**Special**  54:21,
23  55:5, 6
**specifically**
11:22  72:12
**spend**  50:16
**spent**  37:10
50:24

**spoke**  34:2
**spoken**  34:1
**spoon**  13:23
25:1, 5  42:13,
15  44:14, 16
**spoons**  43:16
**stable**  79:8
**stand**  23:5
27:16  76:21
**stands**  19:2
**start**  31:24
**started**  29:20
30:16
**starts**  30:23
**state**  16:25, 25
17:9  20:8
26:2  27:22
29:12  32:4,
10  37:4, 22
38:17  42:2
50:2  55:12,
23  62:1, 3
69:5  76:10
79:25
**stated**  15:4
18:14, 16
29:10  38:19
61:4, 12
**Statement**  3:3,
4, 13, 13, 14
14:19, 24
15:3  40:15
68:23  71:2
**statements**
25:24  40:2
41:4  68:1
**STATES**  1:1,
5  2:4  4:9
6:15  9:17
10:13  15:16
20:14  51:8
56:7  58:2, 24
66:6  69:24
70:7  71:8
74:11
**stating**  15:12
61:8
**Staton**  41:23,
24
**statute**  49:11
**step**  63:8  67:7
**stole**  10:25
**stolen**  11:10
37:7, 19  71:14
**stop**  50:13
45:22
**stopped**  28:21
**storage**  52:19
**story**  13:15

**Street**  2:5
22:22  42:9
68:22
**strength**
69:22  72:14
80:4
**strong**  22:6
68:4  80:5
**stuff**  28:24
30:23  31:13
37:7  38:19
42:18  76:7
**subject**  49:9
**subjects**  26:17
**submit**  21:1
63:10  68:3
69:14, 19
74:17  75:16
**submits**  22:5
**Suboxone**
9:12  10:10,
15  22:14, 14
41:18  58:5,
14  68:9, 24
73:11  77:3
**subpoena**
19:16
**subpoenaed**
19:18
**subsequent**
9:10
**substance**
9:13  24:2
43:18  47:8
58:6
**substances**
21:20  23:13
27:3  41:16
**substantive**
36:12  73:8
77:8
**suddenly**
30:23
**summer**  40:22
**superceded**
19:6
**superceding**
9:1, 6  10:5,
11, 14  18:25
36:15  58:4,
23  67:17
**support**  23:25
67:2  68:20
**supposedly**
80:12
**sure**  28:23
46:17  50:5
**surveillance**
23:17
**sworn**  27:19

(434) 293-3300
www.cavalier-reporting.com

Recorded by Patricia
Cavalier Reporting & Videography

(800) 972-1993
info@cavalier-reporting.com

2:13-cr-00003-NKM  Document 60  Filed 02/18/14  Page 89 of 91  Pageid#: 272

63:22
syringes 24:22
system 77:21

< T >
take 9:5, 17
30:3 43:23
46:6 53:5
74:18 79:24
taken 68:16
76:21
takes 23:5
talk 16:16
38:20 45:23
talked 25:12
29:8 34:20
41:14 48:18
50:25 78:2
talking 19:12
20:19 36:17
50:16 57:20
58:18 76:25
taped 54:2
Tara 52:22
64:18
target 6:21,
22, 24 8:10, 14,
23 15:15, 17,
18, 19, 22 16:2
18:6 35:10
70:2, 3, 4, 11,
15, 17, 18, 20,
21 78:6, 8, 10,
11
target, 16:15
targets 78:17
Task 43:5
teenage 72:18
telephone
35:23 48:19
tell 14:8
16:14 21:4
22:21 27:23
28:16 42:22
43:13 64:3
65:3
telling 33:18
50:6 51:20
59:7 70:13
ten 22:10
39:2, 14
tender 5:1
tendered 7:24
term 42:20
TERRY 2:10,
10
test 25:15
42:15, 18, 21
43:14, 15, 19,
22 46:25 47:3

testified 8:1,
12 9:20 10:3
11:21 13:1
15:23 18:7
20:16 22:10
27:5, 19
38:15 39:24
41:25 58:12
59:20 63:22
68:10, 14
70:22 75:10
77:5 79:10
testifies 8:8, 19
testify 6:11
7:22 19:18,
19, 20 24:13
33:19
Testimony
3:19 6:13
7:4 8:6, 14
17:16 24:8
25:13 33:4
58:15 68:1
71:5
tgrimes@terry
ngrimes.com
2:13
Thank 4:25
14:25 15:1
63:7 67:6, 7
75:18
thereof 81:12
thing 18:18
26:19 37:14
40:9 42:17
62:16 71:7
74:20
things 8:15
11:4 15:12
17:18 18:11
20:3, 20 26:2,
22 27:6 33:9
37:3 43:14,
16 44:22
57:8 59:24
62:19 68:13
69:21 73:2
75:24 76:14
think 15:10
16:5 18:18
19:3 20:22
24:11 25:9,
13, 18, 23
29:14 30:18
32:12 33:7, 8
35:6 39:13,
14 41:23
43:6 48:25
51:11 54:17
55:7 60:1, 21
62:5 64:14,

25 75:22
76:1 79:18
80:15
thought 18:8
24:19 73:17
three 18:13
21:21 26:8
32:7 43:6
57:12 58:13
73:11 77:7, 9
ties 31:12
Tim 39:22
time 5:10, 11
7:7, 11, 21, 22
8:9, 24 10:4,
17 12:25
15:14, 23
16:3, 13, 17, 25
17:1, 5, 13, 16,
19 18:1, 4, 8,
20, 23 19:6, 11,
12 24:16, 20
25:9, 10, 25
27:15 29:5
30:15 33:11
34:5, 14, 21
36:11 37:3,
25 40:25
43:2, 10
45:15 46:15
48:11 50:15,
16, 24 51:2
52:14 54:19
59:15, 19
60:20 68:15
69:6, 8 70:11,
12, 21 72:20,
21 76:13, 23
77:7, 25 79:25
times 18:13
23:10 26:15
39:10
Tobacco 54:24
today 8:17
13:9 19:22
23:5 67:14
74:4, 15 76:6,
17, 21
today's 5:3
6:4, 13 7:16
9:4 67:9
71:16 73:22
74:10
told 6:20 8:2
18:14 26:16
29:11, 16
36:3 40:18,
19 59:17, 18
69:25 77:18
trade 79:20

traditionally
30:20 42:16
55:20
traffic 5:13
trafficking
21:9 67:15
training 43:12
transaction
31:3 36:2
58:8 59:22
68:9
transactions
10:20 19:24
28:13 31:18
73:5
Transcript
3:22 4:23
6:20 7:24
9:15 11:19
16:3, 11
19:10 81:7
troubling 33:8
truck 47:21,
25 48:2
true 13:7, 7
81:7
truly 78:15
trust 9:21
11:7
try 16:24
17:4 29:5
62:17
trying 20:20
31:14 57:10
79:18
turn 9:9 29:1
turned 30:24
78:4
turning 11:19
12:17 13:13
30:23
Turpin 39:20
Twenty-eight
47:11
Twenty-seven
45:20
Twenty-two
45:9
two 12:13, 21
18:13 24:6
26:8, 17, 22, 25
33:19 35:1
37:3 41:7
45:6 57:14
58:13, 22
64:19 67:18
68:25 69:21
73:10 77:17, 18
typed 24:18
types 18:3
41:15

typically 30:1
43:20

< U >
U.S 8:10
Uh-huh 53:23
59:19
undercover
80:13
underneath
42:14
understand
7:1 74:6 78:1
understanding
30:10 35:21
Unidentified
3:21
UNITED 1:1,
5 2:4 4:9
6:15 9:16
10:13 15:16
20:14 51:8
56:7 58:2, 24
66:6 69:24
70:7 71:8
74:11
unrelated
37:23
unrepresented
7:3
USA 52:20
use 8:3 30:21
51:4, 9 58:19
user 24:2
38:23 46:23
66:12 72:18,
24 75:4
users 22:21
uses 27:3

< V >
Valentine's
10:24
vehicle 5:13
vehicles 24:10,
23
verbal 36:2
verbally 65:5
verified 40:17
versus 4:10
Vice 17:3, 5
28:8 43:7
view 54:11
violation 5:13
80:11
VIRGINIA
1:2, 16 2:5,
12 49:11
81:1, 3, 14, 22
voluntarily

19:14
vs 1:7

< W >
wait 51:7
waive 36:23
37:1
waived 22:7
38:12
Walker 51:5
wall 54:2
want 27:12
30:5 38:20
56:18 65:23
67:12
wanted 16:23
17:2 29:5
37:19 62:17
78:9
wants 23:20
63:12
Warrant 3:23
11:11, 15, 17
13:3 24:9, 15
37:4, 16, 22
38:2, 3 41:13
42:2, 8 48:23
49:5, 8, 15, 19
50:2, 15
51:19, 24
52:10 56:24
57:4, 4 62:15,
19 69:1 71:9,
20 72:10
75:22, 25
76:3, 4
waxed 25:20
way 5:7
22:24 37:13
46:2, 5, 6, 10,
13 49:23
61:18 62:10
65:10 74:7
week 24:4
68:25
weeks 41:6, 17
weight 22:3, 5
68:3 71:25
74:7
well 11:9
13:24 14:7
16:14 18:19
21:24 26:12,
21 28:5 35:1
43:7 45:11
53:13 55:20
60:1 72:7
73:16 74:3
76:1 77:1
went 8:15
16:7 38:8

(434)238-3001
www.cavalier-reporting.com

Case 3:13-cr-00003-NKM   Document 69   Filed 02/18/14   Page 90 of 91   Pageid#: 2139

Reported by: Tracy L. Henze
Cavalier Reporting & Videography

(800) 972-3993
info@cavalier-reporting.com

40:8  59:24
73:2
**we're**  4:16
20:18  21:13
30:21  53:1
67:13  70:20
74:15  75:23,
24  76:5, 7, 8,
16, 25
**West**  42:8
**WESTERN**
1:2
**we've**  20:13
21:13, 23
23:17, 18
67:20  75:14
**whatsoever**
62:12  73:1
76:12
**whereabouts**
40:12
**whim**  57:11
**white**  13:18,
23  42:12
**who've**  18:14
**wife**  6:1
10:23  12:12
23:5  44:23
64:17  76:20
79:14
**Wisconsin**
66:25  67:1
**wit**  81:1
**witness**  6:11
15:13  16:2
17:12, 17
19:8  35:7
39:3
**witnesses**  16:1
17:23  18:14,
22  20:16
22:10  23:9,
18  27:4
31:24  32:10,
20  33:1
40:17  52:9
59:18  67:25
68:10  77:5,
18  78:3
**word**  18:16
72:17, 22
**words**  10:12
**work**  7:5
11:14  16:24,
24  17:2, 4
23:17, 21, 21
28:8  29:2
31:11, 15, 16,
17  43:7
55:20  62:2

**worked**  23:20
34:20  46:15
**working**  5:17
6:17  10:21
18:18  20:4
26:19  29:20
35:2, 4  73:25
74:2  77:22
80:12
**works**  23:15
**worse**  79:1
**wrapper**  45:9
**write**  52:16
**written**  49:8
52:10  63:11
**wrong**  71:21
72:2, 4
**wrote**  37:15
48:23  49:14,
18  51:23  54:8

**< Y >**
**yeah**  17:1
30:18  31:21
32:6, 22, 24
33:6  34:2
35:10  45:7
47:5, 19  53:1
**year**  73:13
**years**  8:4
21:21  26:9
39:2  43:6
64:25  72:18
77:7, 9
**young**  12:21
34:11

(414) 298-3007
www.cavalier-reporting.com
Reported by Arlene J. Coonce
Cavalier Reporting & Videography
(800) 731-0993
info@cavalier-reporting.com

Case 2:13-cr-00003-NKM   Document 100   Filed 02/18/14   Page 91 of 91   Pageid#: 2359